255 So.2d 63

Mrs. Myrtle TRAHAN et al.

v.

GULF CREWS, INC., et al.

Nos. 51410, 51443.

Nov. 8, 1971.

Rehearing Denied Dec. 13, 1971.

---

* See State v. Shilow, this day decided, 260 La. 23, 255 So.2d 60.

Jones & Jones, J. B. Jones, Jr., Cameron, for plaintiffs-applicants.

Edgar F. Barnett, Lake Charles, Hinds & Meyer, John K. Meyer, Houston, Tex., Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, Joy S. Miller, New Orleans, for defendants-respondents.

McCALEB, Chief Justice.

The surviving widow and children of Howard J. Trahan, Sr., instituted this suit under the federal maritime law as supplemented by the Jones Act, 46 U.S.C.A. § 688, to recover for his wrongful death by drowning during the course and scope of his employment by defendant, Gulf Crews, Inc. They joined as parties defendant the employer's insurer and the excess underwriters.[1]

In the suit damages totalling $565,000 were sought. The jury trying the case found the defendant-employer liable and fixed the total award at $168,125, with interest, allocated as follows: To Mrs. Myrtle Trahan, the surviving widow, $107,625; to

Delores Ruth Trahan, a minor who was 14 when her father died, $45,500; and to each of the three adult children (Robert Lee Trahan, Howard J. Trahan, Jr., and Beverly Trahan Ogea, a divorced daughter living with the Trahans when he died), $5,000.

The defendant sought a new trial on the ground the evidence did not support the jury finding with respect to the negligence of the defendant-employer; and, further, that the awards were excessive, particularly with respect to the widow, the minor daughter, and the two adult sons. No mention is made of the award to the adult daughter. Alternatively, they sought remittur under Article 1813 of the Louisiana Code of Civil Procedure.[2]

■ The trial judge denied this motion, holding the evidence sustained the jury finding on the merits, and the awards were not excessive.[3] Defendants appealed to the Court of Appeals for the Third Circuit.

1. Continental Insurance Co. of New York is the insurer of the defendant employer. Gilbert Arthur Russell and Orion Insurance Company are the excess underwriters.

2. The United States Supreme Court held in Dimick v. Schiedt, 1935, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603, 95 A.L.R. 1150, that *additur* is an unconstitutional invasion of jury prerogatives under the Seventh Amendment. And although it expressed doubt as to the constitutionality of *remittur* on this same ground, it indicated that since the practice had been established in 1822 in Blunt v. Little, Fed.

Cas.No.1,578, 3 Mason 102 (C.C.Mass.), it should not be disturbed. It termed remittur as "an exercise in 'lopping of an excrescence' of the verdict," without defining what amounted to "excrescence." The lower courts have devised different tests to define it. See, Section 1305.1 of Barron & Holtzoff's work on Federal Practice and Procedure, Volume 3, at page 374. See Rule 59, 28 U.S.C.A., for the new Federal Rules.

3. Where the trial court denies such a motion on the ground the award is not excessive, an appellate court will review that ruling only in extreme cases. Nay-

The appellate court affirmed on the merits, 246 So.2d 280. As to the quantum, the court found the amounts awarded the minor daughter and the two adult sons to be "grossly excessive" on the theory the case was brought and tried solely on the Jones Act, concluding that there was no proof these children would have received from their father—had he lived—pecuniary benefits sufficient to justify the awards. No analysis was made by the court with respect to the awards to the widow and adult daughter. However, stating it was without authority to "change the finding of fact of the jury as to the quantum," the court remanded the case for "a new trial." We granted these writs as to all parties, both plaintiffs and defendants. 258 La. 913, 248 So.2d 585.

■ In reaching its decision the appellate court properly recognized that its review of the jury verdict in suits under the general maritime law as expanded by the Jones Act is, necessarily, the same as that of the federal courts. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; McAllister v. Magnolia Petroleum Co., 357 U.S. 221, 78 S.Ct. 1201, 2 L.Ed.2d 1272; and Macomber v. De Bardeleben Coal Co., Inc., 200 La. 633, 8 So.2d 624.[4] The defendants do not dispute this.

■ Accordingly, although Louisiana appellate courts have the constitutional authority[5] to review both the law and the facts of a case, they may not, under federal law and jurisprudence, disturb the finding of a trial jury on the merits in such cases unless there is no reasonable basis for the jury's conclusion the death or injury resulted from the negligence of the defendant-employer. Rogers v. Missouri Pacific R. Co., supra; Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798; and Lavender v. Kurn, supra.

lor v. Isthmian S. S. Co., 2 Cir., 187 F. 2d 538. As stated in Gorsalitz v. Olin Mathieson Chemical Corp. (5th Cir. 1970), 429 F.2d 1033, where a trial judge, who has had the opportunity to observe the witnesses and consider the evidence "in the context of a living trial rather than upon a cold record," his finding adds weight to the jury's award as to the correctness of the quantum of damages. The review court is, thus, reluctant to find the jury award is unreasonable or extravagant. In fact, the trial court's ruling the award is not excessive is held to be controlling in the absence of obvious abuse of discretion or clear mistake. Jenkins v. Associated Transport, Inc. (6th Cir. 1964), 330 F.2d 706; and Sanford Bros. Boats, Inc. v. Vidrine (5th Cir. 1969), 412 F.2d 958.

4. The ruling in the Macomber case supports the case under review. However, in that matter, the death occurred in inland waters of Louisiana. The United States Supreme Court refused to review our holding. 317 U.S. 661, 63 S.Ct. 61, 87 L.Ed. 532.

5. Section 29 of Article VII of the Louisiana Constitution.

In the Rogers case the United States Supreme Court, in reversing a decision of the Supreme Court of Missouri, which had set aside an award in a FELA [6] case on the ground plaintiff's proof did not establish defendant's liability, held that in such cases the judicial right of review of facts is restricted to the single inquiry of whether, within reason, the evidence adduced supports the conclusion that the negligence of the employer played any part at all in the injury or death of the employee. The court stressed the special and important reasons for granting certiorari in such cases "when lower federal and state courts persistently deprive litigants of their right to a jury determination" by substituting their own view of the facts for the jury's findings and, in this manner, erode Congressional intent in the enactment of such acts "by narrow and niggardly construction."

In Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520, the court said: "The very essence of (the jury's) function is to select from among conflicting inferences and conclusions that which it considers most reasonable." And, in the Ellerman case, supra, the court emphasized that neither it "nor the Court of Appeals can redetermine facts found by the jury any more than the District Court can predetermine them."

In Lavender v. Kurn, supra, the United States Supreme Court further elucidated: "It is no answer to say that the jury's verdict involved speculation and conjecture. * * * Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where * * * there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."

■■■■ On the merits of the case, therefore, we concur with the appellate court's affirmance of the jury verdict. There was ample evidence on which the jury could base its conclusion that Trahan's death resulted from the negligence of the defendant-employer. This is particularly true in view of the extraordinary duty the law places on shipowners and masters in cases of rescue from the water.[7]

6. Congress made the Federal Employers' Liability Act applicable to seamen when it enacted the Jones Act.

7. The law places on a shipowner or his representatives the positive duty to exert all reasonable efforts to rescue a seaman who has gone overboard, from whatever cause, and any inaction on his part "must be cast by the law on him and the ship, and not on the helpless man in the water. * * * A master who abandons a missing seaman while there is yet a reasonable opportunity to save him, acts at his

The facts developed during the trial as found by the appellate court are not seriously challenged by the defendants. These reveal that Trahan "was the master of the M/V Don, an 85-foot boat used to service .offshore oil rigs. Other crew members were Cyril Darbonne, the engineer, and Wesley LeBouef, deckhand. The boat was being used to fulfill a contract to service wells of Shell Oil Company about 60 miles offshore from Morgan City, Louisiana. The crew's duty was seven days and nights at sea, and seven days and nights on shore, off duty. During the day they went from platform to platform to service the Shell Oil Company operations. At night they returned to Platform B to stand by. Platform B stood some 60 feet above the water with a boat landing deck about 10 feet above the water.

"At approximately 6:00 p. m. on March 14, 1969, Captain Trahan and his crew secured the M/V Don to Platform B by two mooring lines and went to the living quarters on the platform where they ate dinner and watched television. During the time they were aboard Platform B, the weather gradually worsened. The wind reached gale force, with seas running 12 to 14 feet, and the M/V Don broke its mooring line and began to drift away. Captain Trahan was making his way down toward the boat landing, as he had done several times earlier that evening to check on the boat, when he saw that the mooring line had broken. He rushed to the platform landing. He took off his hat, coat, and shoes and told LeBouef, his deckhand, to 'get a life ring.' Then Trahan jumped, either in an attempt to board the board or to dive in the water and swim to the drifting boat. LeBouef, in the meantime, fumbled with the life ring, which was attached to the railing by means of a bracket at the level of 10 feet above the water. Darbonne also went over to help LeBouef get it loose. Finally, LeBouef secured the life ring and, with it in his hand, ran to the railing edge. At that moment Trahan was in the water near or back of a piling approximately 15 feet away. *Neither LeBouef nor Darbonne ever threw out the life line.* Captain Trahan disappeared into the sea. He was last seen swimming toward the M/V Don. His body was never recovered." (The emphasis has been supplied.)

█ As pointed out above, the rescue of a person in the water gives rise to an exceptional duty and accountability. The underlying character of the duty the employer owes a seaman overboard is such that, although it is less than a duty to rescue him, regardless of the cause for which he went overboard, it is a *positive obligation* to make

own risk." Gardner v. National Bulk Carriers, 4 Cir., 310 F.2d 284, 91 A.L.R. 2d 1023. See, also, the annotation at

91 A.L.R.2d 1032, and the discussion at 30 NACCA Law Journal 344.

a *sincere attempt at rescue*. Gardner v. National Bulk Carriers, 310 F.2d 284, 91 A.L.R.2d 1023 (4th Cir.); Harris v. Pennsylvania Railroad Co. (4th Cir.), 50 F.2d 866; Macomber v. De Bardeleben Coal Co., 200 La. 633, 8 So.2d 624; and the annotations at 91 A.L.R.2d 1032; and 30 NACCA Law Journal 344.

As stated in the Gardner case, "The duty is of such nature that * * * Once the evidence sustains the reasonable possibility of rescue, *ample or narrow*, according to the circumstances, *total disregard of the duty*, refusal to make even a try, as was the case here, imposes liability." (Emphasis added)

 As pointed out above, the jury plays a pre-eminent role in seamen cases.[8] From the facts adduced during the trial, the jury here could readily have concluded the defendant-employer's representatives were

negligent in failing to make any attempt to rescue Trahan. It could also have found that the shipowner was negligent in failing to furnish a seaworthy vessel, as alleged in the petition, in that the equipment was not reasonably safe and the crew was not competent.[9]

 Moreover, although contributory negligence does not bar recovery in such cases, serving only to mitigate damages,[10] the jury could well have concluded from the facts there was no negligence on Trahan's part that would serve to mitigate the damages. As master of the M/V Don it was Trahan's duty, in the highest tradition of the sea, to make every effort to save the boat of his employer. His reliance on his crew to assist him in this respect is evident. The life ring he asked them to throw was on Platform B. However, even though it was finally secured after much fumbling on

8. Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed. 2d 511; Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482.

9. The appellate court points to evidence adduced by plaintiff to show the mooring lines in use on the M/V Don were of inadequate size and in defective condition. There was no lifesaving equipment readily available, and the crew fumbled with such as was available. Seaworthiness includes not only reasonably adequate and safe equipment but also a competent crew. The Magdapur, D.C., 3 F.Supp. 971; Spellman v. American Barge Line Co., 3 Cir., 176 F.2d 716; Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18

L.Ed.2d 482; Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20; Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354, and the authorities therein cited.

10. As stated in Kirincich v. Standard Dredging Co. (1940, CA3 N.J.), 112 F. 2d 163, "To the duty of rescue there is no defense of contributory negligence." Its only function is to serve in mitigation of damages. See, 48 Am.Jur. 126, Section 181; 32 Am.Jur.2d 246, Section 7; Norris, The Law of Seamen, Volume 2 at page 421, Section 698; and the authorities therein cited.

the part of LeBouef and Darbonne, they made no attempt to throw it to him or to rescue him by other means.[11]

Under such circumstances, we find unimpressive the defense argument that these facts reveal Trahan could not or would not cooperate in his rescue, stress being placed on the fact that neither LeBouef nor Darbonne could see him in the water after they secured the life ring. The law placed on them the duty to throw the ring in an attempt to save Trahan. In view of the fact that the platform was well lighted, it may well be that, albeit in the water, Trahan could have seen the life ring had it been thrown and have saved himself. This is something no one will ever know.[12]

Defense counsel argue at length with respect to sudden emergency, contributory and comparative negligence, and the high degree of responsibility resting on a master of a vessel with respect to its safe condition. They object to the trial judge's refusal to give several jury charges they requested in this respect.

We find these arguments untenable. The law with respect to sudden emergencies has no application in rescue cases, for the law leaves no discretion to representatives of the defendant-employer. Macomber v. De Bardeleben Coal Co., supra. As pointed out above in footnote number 10, there is no defense of contributory negligence in the case of rescue from the water. This is true regardless whether the duty or responsibility of a captain generally is greater than that of the ordinary crewman. Furthermore, we find the trial judge charged the jury at length with respect to contributory and comparative negligence, giving percentage examples with respect to the latter.

Inasmuch, therefore as there was evidentiary basis for the jury's finding that the defendant-employer was negligent, the appellate court properly refused to disturb its conclusion on the merits.

We find, however, that the appellate court erred in remanding the case for a new trial[13] on the question of quantum after it had concluded the jury award as to the

11. Among other means to be employed in a rescue attempt under rules of the Coast Guard is 185.25–5(b) (4), which reads: "Have crewmember put on lifejacket, attach a safety line to him and have him standby to jump into the water to assist the person overboard if necessary."

12. In Gardner v. National Bulk Carriers, 310 F.2d 284, 91 A.L.R.2d 1023, it was pointed out that another consequence flowing from failure to make an attempt to rescue, and which has been held in analogous situations to have fixed responsibility on the part of the wrongdoer, is that it obliterates "all possibility of evidence to prove whether a search, if undertaken, would have succeeded or failed."

13. The conclusion we have reached makes it unnecessary for us to determine the correctness of this procedure.

minor daughter and two adult sons was "grossly excessive." [14]

State appellate review of jury awards under maritime law and the Jones Act is, as in the federal courts, "extremely limited." They must stand unless the appellate courts find there is no law and no evidence to sustain them, rendering them, as some courts have put it, so excessive as to be obviously punitive, motivated by prejudice, passion, partiality, or corruption. This is particularly true where the trial judge, finding the jury award is not excessive, has denied a new trial and/or remittitur. Naylor v. Isthmian S. S. Co., 2 Cir., 187 F.2d 538; Jenkins v. Associated Transport, Inc., 6 Cir., 330 F.2d 706; Sanford Bros. Boats, Inc. v. Vidrine, 412 F.2d 958; Volume 2 of Norris's Treatise on "The Law of Seamen" 429, (3rd Edition, 1970); and the authorities therein cited.

The appellate court's conclusion that the jury award in the instant case to the minor daughter and two adult sons was grossly excessive is predicated on the theory the suit was instituted and tried solely under the Jones Act. It felt foreclosed, therefore,

from giving consideration to the greatly expanded field of recovery for wrongful death under admiralty law as approved by the United States Supreme Court in Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339. The court thus applied what it considered to be the standard of anticipated pecuniary benefits flowing to these survivors during the projected life of Trahan.[15]

Defense counsel, on the other hand, argue that inasmuch as Trahan's death occurred on the high seas, the correctness of the awards must be determined in the light of the 1920 Death on the High Seas Act since this is a matter exclusively within the province of federal admiralty law.

We find both contentions to be incorrect. Contrary to the appellate court view, the plaintiffs in this action sought recovery for negligence under the Jones Act and for unseaworthiness under the general maritime law, which they may do in one suit. Norris, The Law of Seamen, Vol. 2, Sec. 665 (3rd Edition, 1970).

And despite the defense contention that the case is controlled exclusively by the 1920 Death Act and jurisprudence,[16] the United

---

14. The appellate court did not analyze or hold that the award to the surviving widow and the major daughter living with the Trahans is excessive.

15. Even under this standard, the court failed to give consideration to Trahan's pain and suffering, even though for a

short time. "The Law of Seamen" by Norris, Volume 2, page 417, Section 697, and the authorities therein cited. The court also failed to allow for any promotion or increase in pay to Trahan during the remainder of his life, or increase in the cost of living. See Annotations at 13 L.Ed.2d 1013 and 12 A.L.R.2d 611.

States Supreme Court in Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed:2d 360, held that under the Outer Continental Shelf Lands Act, 43 U.S.C.A. §§ 1331–43, drilling platforms are not within admiralty jurisdiction even though these structures, termed "artificial islands", are more than a marine league from shore and surrounded by high seas. In concluding the 1920 Death Act is an inappropriate remedy in such matters, it held these structures are within the territory of the adjacent state the same as though the state boundaries extended that far from shore.[17]

In the Rodrigue case two men were killed while working on such an artificial island on the Outer Continental Shelf off the Louisiana coast. Suit was instituted in the federal district court of Louisiana, those suing claiming damages under the 1920 Death Act, and also *additional damages under Louisiana Law,* including Article 2315 of the Revised Civil Code. The federal district and appellate courts held the remedies under the 1920 act were exclusive, and the more extensive remedies under Loui-

siana law were not applicable. On certiorari, the United States Supreme Court reversed, holding the Outer Continental Shelf Lands Act, supplemented by the law of the adjacent state, furnishes, the appropriate remedy in such cases. During the course of its opinion the court said: " \* \* \* if the Congress had made the 1920 Seas Act applicable, ousting inconsistent state law, the artificial island worker would be entitled to far less comprehensive remedies in many cases than he is now."[18] See, also, Fontenot v. Nicklos, Drilling Co., 5 Cir., 429 F.2d 569.

While in the instant case death did not actually occur on the platform, Trahan was engaged in the business of servicing Platform B. He left this structure to rescue the foundering boat of which he was the master with reliance on assistance in his rescue from his crew by their use of equipment on Platform B. It is our opinion, therefore, that Trahan's death comes within the purview of the Outer Continental Shelf Lands Act, notwithstanding that he drowned in the sea immediately adjacent to the platform.

---

16. Although there is jurisprudence to the contrary (Pope v. Moore-McCormack Lines, Inc., Mass., 269 N.E.2d 706, and the authorities therein cited), state and *federal governments have concurrent jurisdiction* under the 1920 Death Act. See, American Law Institute, "Study of the Division of Jurisdiction between State and Federal Courts," and 1969 Trial Lawyer's Guide 27.

17. Because of the confusion and inequities that have arisen under the varying provisions relating to seamen, longshoremen, and others, there is now under consideration in Congress the creation of a National Maritime Death Act. See, page 51 of the December/January 1969–1970 issue of "Trial."

18. See a discussion of the Rodrigue holding in 44 TLR 354.

· To hold otherwise would be to deprive a worker on one of these structures, who happened to be injured or drowned as the result of a fall into the sea, of the greater remedies afforded under the Rodrigue decision. It would also be contrary to the more enlightened and liberal view in such matters, as reflected by the Moragne decision, which has greatly expanded the field of recovery for wrongful death under admiralty law to meet changing conditions and concepts affecting industry's duty toward its workers.

Consequently, the appellate court, in concluding the jury awards to the minor and two adult sons were grossly excessive, erred in restricting the basis of that recovery to the actual pecuniary benefits they might have derived from Trahan had he lived his allotted time. Not only was the suit also prosecuted under the general maritime law for unseaworthiness, but, in view of the applicability of Article 2315 of the Revised Civil Code under the Rodrigue decision, the plaintiffs were also entitled to damages for grief, anguish, and loss of love, companionship and guidance.

Being of this view, we cannot say that the award of $45,500 to the minor daughter, and the awards of $5,000 to each of the two adult sons is grossly excessive, or that the award to the widow is overly extravagant. It would appear in this light that the award of only $5,000 to the major daughter living with the Trahans is inade-

quate. However, because of our limited right of review in suits brought under the general maritime law as expanded by the Jones Act, this award may not be disturbed.

While it is true, as contended by defendants, that the trial judge did not instruct the jury that they might consider loss of companionship and other damages properly assessable under Article 2315 of our Civil Code, we feel that in view of all factors in this case it would serve no useful purpose to remand the matter to the district court so that the judge might properly instruct another jury, in fixing the quantum of damages to give consideration to those damages recoverable under the Outer Continental Shelf Lands Act, as interpreted in the Rodrigue decision.

This leaves for our consideration the argument of defendants that the trial judge erred, in excluding from the jury, evidence as to the payment to Mrs. Trahan of $5,000 under a policy on Trahan's life, the premiums for which were paid for exclusively by the employer.

This contention is without merit. Such premiums were paid by the employer as a part of the compensation due Trahan and, thus, were tantamount to Trahan's payment of them. Furthermore, it is well settled in the federal courts that evidence showing the deceased was insured "creates a substantial likelihood of misuse" by juries.

See Eichel v. New York Central R. Co., 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307.

For the reasons assigned, the judgment of the Court of Appeal for the Third Circuit, insofar as it remands the case to the trial court for a new trial on the quantum of damages, is reversed and the judgment of the district court is affirmed and reinstated.

DIXON, Justice (dissenting).

I must respectfully dissent.

It is not the result reached that appears to be erroneous, but the way in which the majority reaches its result.

With no apparent necessity, we hold that our constitutional right and duty to review the law and the facts [1] is wholly inoperative in Jones Act and F.E.L.A. cases. This court has never reached that conclusion before. Neither has any federal appellate court that we have found.

The question is: in a Jones Act case, does a jury verdict in a Louisiana district court attain the "untouchable" status of a common law jury verdict, or can the Louisiana appellate courts proceed to exercise their constitutional function and examine the evidence to determine whether its supports the verdict, with due regard to the "much discretion" which must be left to the jury? C.C. 1934.

The majority does examine the evidence in order to reach the conclusion that the Court of Appeal "properly refused to disturb its (the jury's) conclusion on the merits." It is probable that a similar examination of the evidence on quantum would lead us to the conclusion that the jury's award of damages is not excessive, according to Louisiana standards. But we should not abandon any part of the appellate function of Louisiana courts until we are required to do so.

Certainly not standing for the proposition (that the Louisiana constitutional provisions for appellate review are to be ignored in Jones Act cases) is the only Louisiana Supreme Court case cited by the majority— Macomber v. De Bardeleben Coal Co., Inc., 200 La. 633, 8 So.2d 624. In the Macomber case, the Court of Appeal had reversed a jury verdict in favor of the plaintiff in a Jones Act case. The Louisiana Supreme Court examined the evidence for the reason

1. "The Supreme Court has control of, and general supervisory jurisdiction over all inferior courts. * * *
"In civil cases, its appellate jurisdiction extends to both the law and the facts. In criminal matters, its appellate jurisdiction extends to questions of law only." La.Const., Article 7 § 10.
" * * *

All appeals of which the courts of appeal have appellate jurisdiction as provided in this Section shall be on both the law and the facts, except where the appeal is limited to questions of law only by any other Section of this Constitution." La. Const., Article 7 § 29.

that "unless the conclusion reached by the jury was manifestly erroneous, the Court of Appeal was not warranted in reversing the jury's verdict." 8 So.2d at 630. The jury verdict was reinstated after the court examined the evidence and found the verdict not to be "manifestly erroneous." This is not the common law test, nor the federal test in maritime injury and F.E.L.A. cases. If there is *some* evidence, or *any* evidence to support the jury verdict, the federal rule is that the verdict must stand.

None of the United States Supreme Court cases cited by the majority dealt precisely with the situation before us. None of them considered the force of a state constitutional provision defining the power and duty of the state appellate courts. Those considering the appellate power of review of a jury verdict seem to have assumed that the power of review in the common law state court systems and the federal system are the same.

The one United States Supreme Court case involving differences in jury practice like those to be found in the Louisiana system is Minneapolis & St. Louis Railroad Co. v. Bombolis, 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961. Bombolis was an F.E.L.A. case tried in the Minnesota state court. Under the Minnesota Constitution and statutes, after a jury has had a case for more than twelve hours without a unanimous verdict, ten of the twelve jurors can concur in a verdict. To this procedure the defendant objected, arguing that the defendant was entitled, under the Seventh Amendment of the United States Constitution, to a unanimous verdict according to the common law. Chief Justice White disposed of this contention, pointing out that the Seventh Amendment applies only to proceedings in the courts of the United States. The rest of the Bombolis opinion, it is true, has no vitality today, for Chief Justice White went to exaggerated lengths to explain what was "completely and conclusively * * * settled"—the first Ten Amendments "are not concerned with state action, and deal only with Federal action." 241 U.S. at 217, 36 S.Ct. at 596, 60 L.Ed. at 963. Nevertheless, the case has not been overruled, and must be considered authoritative, at least for its peculiar facts, which are like those before us.

Bombolis comes much closer to touching the issue before us than the cases cited in the majority opinion. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916, was an action under 45 U.S.C.A. § 51, brought in the state courts. The Missouri Supreme Court reversed a jury verdict in favor of the plaintiff, holding that there was no substantial evidence to support the submission of the case to the jury. That court was reversed by the United States Supreme Court, which said: "We hold, however, that there was sufficient evidence of negligence * *

to justify the submission of the case to the jury and to require appellate courts to abide by the verdict rendered by the jury." 327 U.S. at 652, 66 S.Ct. at 743, 90 L.Ed. at 922. If the Lavender decision was concerned with a difference between the state and federal systems over the impregnability of a jury verdict, it does not appear in the report of the case.

Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493, did not in any way discuss a conflict between state and federal practice on appeal. Rogers and Lavender involve the same issues, and are both from the Supreme Court of Missouri. In both, the question was whether there was sufficient evidence to give the case to the jury. The majority said, "We think that the evidence was sufficient to support the jury finding for the petitioner." 352 U.S. at 503, 77 S.Ct. at 447, 1 L.Ed.2d at 497. Justice Frankfurter dissented, saying: " * * * this Court should not be reviewing decisions in which the sole issue is the sufficiency of the evidence for submission to the jury." 352 U.S. at 526, 77 S.Ct. at 461, 1 L.Ed.2d at 521. Justice Harlan, in his dissent, also saw the case as involving only a question as to the sufficiency of the evidence.

The only question decided in McAllister v. Magnolia Petroleum Co., 357 U.S. 221, 78 S.Ct. 1201, 2 L.Ed.2d 1272, was whether

the three year prescriptive period provided by Congress in the Jones Act, or the Texas two year prescriptive period for an unseaworthiness claim would be applicable when the two claims were joined in one action, as they must be if the injured seaman is to utilize fully his remedies for personal injury. It is only by inference, if then, that McAllister can be considered applicable to the case before us.

Atlantic & Gulf Stevedores v. Ellerman Lines, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798, was tried in the federal district court, and came up through the federal system. No question of state law seems to have been involved. The Seventh Amendment was mentioned, but just barely.

Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520, was likewise tried in the federal district court. A judgment n. o. v. had been granted, and the Supreme Court reversed, saying the courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511, was also tried in a federal district court, and there was no majority opinion. The United States Court of Appeals for the 2nd

Circuit, having reversed the jury verdict, was in turn reversed by the Supreme Court, because the jury could have concluded that negligence of the employer ("even the slightest" under the statute) contributed to the injury of the ship's baker.

Similarly, Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482, involved (in the words of the majority opinion): "The single legal question presented by this case is whether a vessel is unseaworthy when its officers assign too few crewmen to perform a particular task in a safe and prudent manner." 87 S.Ct. at 1410.

Brown v. Western Railway of Alabama, 338 U.S. 294, 70 S.Ct. 105, 94 L.Ed. 100, did involve a Georgia rule of practice requiring the allegations of the pleading to be construed "most strictly against the pleader." The United States Supreme Court construed the allegations of the complaint itself, and found, contrary to the Georgia courts, that a fair construction of the pleading stated a cause of action. The majority opinion found that this over-exacting local requirement unduly infringed upon the assertion of a "federally created" right.

No such disrespect of the law of the land (Justice Black's phrase in the Brown case, supra) can be found in this case if we exercise our constitutional obligation to review the facts to determine whether the verdict is grossly excessive. The majority opinion dispels any such thought when it holds that items of damages which plaintiffs might claim under C.C. 2315 (the *State* wrongful death statute) greatly expand what might be justifiably awarded in a Jones Act case.

The history of F.E.L.A. cases and maritime injury cases teaches that the United States Supreme Court has been a jealous guardian of the rights Congress granted to seamen and railroaders—even to the point of granting writs to review evidence. That history parallels the history of workmen's compensation cases in the Louisiana Supreme Court, which leaves no room for any doubt that the congressional acts could be administered as well under the Louisiana system as under the common law system.

As seen from the jurisprudence reviewed, a case has not been made for imposing the common law jury system upon Louisiana. True, modern federal-state relations justify pessimism on the part of the state in the event of a conflict. But where the conflict? No one has yet demonstrated that congressional intent in seamen's and F.E.L.A. cases is incompatible with the Louisiana constitutional scheme of judicial administration. Until there is such demonstration, it is hard to understand why the Louisiana appellate

method should suffer this common law transplant.

We should, therefore, not anticipate unnecessary federal disregard of state constitutions. We should follow our basic law and review the evidence to determine whether the jury abused its discretion in fixing damages.

Rehearing denied.

SUMMERS, J., is of the opinion a rehearing should be granted being of the present opinion the result is correct, only.

BARHAM, Justice concurs in the denial of the rehearing being of the opinion, however, that the action and our review were controlled by the Jones Act. The total award of damages was not excessive under the standards of that Act, although the individual allotments in isolation were excessive. The majority incorrectly applied the Outer Continental Shelf Lands Act to this maritime death. If the Lands Act were applied we would be required to remand in order that the trial court appropriately apply the state remedy under C.C. art. 2315 which is incorporated in a proceeding under the Lands Act.

DIXON, J., is of the opinion that a rehearing should be granted.