DOMENGEAUX, Judge.
Plaintiff, Wilson Smith, brought this suit against his employer, Cameron Crews, Inc., Cameron Boat Rentals, Inc., Mobil Oil Corporation, and Insurance Company of North America (Cameron Crews’ insurer), under the Jones Act, 46 U.S.C.A. Sec. 688 and the general maritime law. During the course of the trial the suit was dismissed insofar as defendants Mobil Oil Corporation and Cameron Boat Rentals, Inc., were concerned. Additionally, plaintiff dismissed his maintenance and cure and unseaworthiness actions.
Plaintiff made the following allegations against defendants:
1. The failure to give plaintiff a pre-em-ployment physical as is the alleged custom of the industry;
*181 2. The hiring of plaintiff without an operator’s license;
3. The violation of U. S. Coast Guard regulations; and
4. Failure to provide a physically competent crew.
The suit was tried before a jury, and it rendered a general verdict for the plaintiff and against defendants in the amount of $150,000.00 with interest. Defendants appealed. We affirm the judgment of the jury.
The plaintiff, Wilson Smith, was the captain of the motor vessel Miss Judy. He had worked aboard the Miss Judy for two years and four months without incident. While on the Miss Judy, plaintiff awoke the morning of February 28,1974, with symptoms of a light stroke. His shipmate, McKinley Sa-voie, discovered that Smith was ill and called for a helicopter to take him back to shore. Mr. Smith suffered permanent brain damage and especially his speech was severely impaired.
The M/V Miss Judy is a steel, diesel powered, offshore crew boat, built in 1963, having a registered length of 61.1 feet. The boat was owned by Cameron Boat Rentals, Inc., and was manned by a sister Louisiana corporation, Cameron Crew Boats, Inc. Mobil Oil Corporation had chartered the boat to service Mobil’s stationary platforms located in the Gulf of Mexico offshore of Cameron Parish, Louisiana. The vessel’s intended purpose was to carry water, heavy cargo, and passengers from dock site to the platform. At the time of plaintiff’s injury the vessel was being used to transport a Cameron Construction Company crew of six men, plus Mobil’s pumpers in the vicinity of its offshore platforms. The vessel was also required to stand by at sea, laying off a platform that was used as sleeping and working quarters for Mobil employees or subcontractors.
The vessel possessed a required Certificate of Inspection issued by the U. S. Coast Guard on June 23, 1972, effective through June 23, 1975. This Certificate of Inspection required a crew of two ocean operators and two deckhands. A manning exception provided that when operating not more than twelve hours in any twenty-four hour period the vessel might be operated with only one ocean operator and one deckhand.
Captain Smith did not have an ocean operator’s license. In order to get an ocean operator’s license, one must pass a written test and a physical test. Captain Smith’s duties were 7 days on and 7 days off.
During the approximately two and one-half years of plaintiff’s employment with Cameron Crews, Inc., he was examined and treated for various problems on at least three occasions by Dr. Cecil Clark, Public Health Service physician in Cameron. Pri- or to his employment in August of 1967, Doctor Clark was called to the Smith home to attend the plaintiff. Doctor Clark referred Wilson Smith to Dr. George Anderson, a cardiologist from Lake Charles, who hospitalized him for a few days and sent him back to Doctor Clark with a recommendation that plaintiff stop using tobacco, alcohol, and coffee. Mr. Smith’s condition was diagnosed at that time as an irregular beating of the heart.
Doctor Clark continued to treat Wilson Smith for this condition through the end of 1967 and through February of 1968. In February of 1970, Smith was hospitalized for pneumonia.
Doctor Clark was a certified Public Health Service physician, and Smith obtained treatment by signing his own master’s certificate of service as master of the motor vessel Emily. Doctor Clark at all times knew Smith was working in the Gulf of Mexico.
Smith was hired by Cameron Crews, Inc. in September of 1971. He worked for a few months as deckhand and subsequently was made alternate captain of the motor vessel Miss Judy. Smith’s stroke occurred on the morning of February 28,1974. Doctor Clark diagnosed Mr. Smith’s condition as a cerebral vascular accident as opposed to a “full blown stroke”. His diagnosis was subsequently confirmed by Doctor Foster, a neurosurgeon from Lake Charles. Doctor Foster testified that plaintiff had arterio *182 sclerosis, and that many things contribute to arteriosclerosis, which is one cause of stroke. Doctor Clark testified that he would have failed plaintiff on a physical exam in 1971 because of plaintiff’s high blood pressure. That was the same year that plaintiff was employed by Cameron Crews. Doctor Clark testified, as did Doctor Foster, that many things contribute to stroke or hear attack. He said that the stress of the job in the Gulf of Mexico was one contributing factor among many, including family history and diet. Plaintiffs cardiac problem first appeared in 1967 and he took medication off and on for the following years.
It is proper to point out at the outset of our discussion that the scope of our review in Jones Act cases is the same as that accorded the Federal Appellate Courts. See Trahan v. Gulf Crews, Inc., 260 La. 29, 255 So.2d 63 (1971). This court stated in Hocut v. Insurance Company of North America, 254 So.2d 108 (La.App. 3rd Cir. 1971) that:
“In Trahan v. Gulf Crews, Inc. supra, we quoted from Rogers v. Missouri Pacific Railway Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493, thusly:
‘It is no answer to say the jury’s verdict involved speculation or conjecture * * * Only where there is a complete absence of probative facts to support the conclusion reached does a reversible error appear * * * the appellate court’s function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.’ (Emphasis added) Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916.
The scope of our review of this case, then, is severely limited by federal law and we shall confine ourselves within those limits in examining the jury’s verdict.”
We deem it also advisable to point out language from a recent U. S. Court of Appeal, Fifth Circuit, decision, Landry v. Two R. Drilling Co., 511 F.2d 138 (1975).
“The second point requires only a brief answer as well. The burden on the plaintiff to prove proximate cause in actions based on the Jones Act and general maritime law is very light. Indeed, the most noted commentators in the field have called it ‘featherweight.’ Gilmore & Black, Admiralty (1957), § 6-36, p. 311. The jury in such cases is entitled to make ‘permissible inferences from unexplained events,’ Johnson v. United States, 333 U.S. 46, 49, 68 S.Ct. 391, 92 L.Ed. 468 (1948), whether the case is brought under the Jones Act, id., or under general maritime law, Alaska Steamship Co., Inc. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 per curiam (1954). The Supreme Court has repeatedly said that it is not the function of the court in Jones Act and analogous cases to ‘search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that proof gives equal support to inconsistent and uncertain inferences.’ Tennant v. Peoria & P.U.R. Co., 321 U.S. 29, 35, 69 S.Ct. 409, 412, 88 L.Ed. 520 (1944); Schulz v. Penn. R. Co., 350 U.S. 523, 526 n. 8, 76 S.Ct. 608, 100 L.Ed. 668 (1956).”
Plaintiff alleges that there exists a custom of providing employees with pre-em-ployment physicals before allowing them to work in the Gulf of Mexico. We find no evidentiary basis for this custom.
Plaintiff also argues that the violation of Coast Guard regulations is negligence per se. We agree. See Keman v. American Dredging Company, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382. In Kernan, the Coast Guard regulation required that a lamp be carried not less than eight feet from the water. The rule was to prevent collisions. The lantern in question was carried only three feet above the water and eventually ignited gasoline on the river, resulting in the burning and subsequent death of the seamen aboard the tug. The fire was held to be caused by a violation of a Coast Guard regulation rule which had nothing to do with fire prevention. The recovery was allowed because the violation *183 played a part, no matter how small, in bringing about the seamen’s death.
The Coast Guard regulations in question here are as "follows:
“§ 390a. Inspection — Frequency and requirements
(a) The Secretary shall, at least once every three years, cause to be inspected each passenger-carrying vessel, and shall satisfy himself that every such vessel (1) is of a structure suitable for the service in which it is to be employed; (2) is equipped with the proper appliances for lifesaving and fire protection in accordance with applicable laws, or rules and regulations prescribed by him; (3) has suitable accommodations for passengers and the crew; and (4) is in a condition to warrant the belief that it may be used, operated, and navigated with safety to life in the proposed service and that all applicable requirements of marine safety statutes and regulations thereunder are faithfully complied with.
§ 390b. Rules and regulations
In order to secure effective provision against hazard to life created by passenger-carrying vessels and to carry out in the most effective manner the provisions of sections 390-390g, 404, and 526f of this title, the Secretary shall prescribe such rules and regulations as may be necessary with respect to design, construction, alteration, or repair of such vessels, including the superstructures, hulls, accommodations for passengers and crew, fittings, equipment, appliances, propulsive machinery, auxiliary machinery, and boilers; with respect to all materials used in construction, alteration, or repair of such vessels including the fire prevention and fire retardant characteristics of such materials; with respect to equipment and appliances for lifesaving and fire protection; with respect to the operation of such vessels, including the waters in which they may be navigated and the number of passengers which they may carry; with respect to the requirements of the manning of such vessels and the duties and qualifications of the operators and crews thereof; and with respect to the inspection of any or all the foregoing. May 10, 1956, c. 258, § 3, 70 Stat. 152.
§ 390c. Certificate of inspection — Issuance prerequisite to operation; exception
(a) No passenger-carrying vessel shall be operated or navigated until a certificate of inspection in such form as may be prescribed by the regulations promulgated by the Secretary under the authority of sections 390-390g, 404, and 526f of this title, has been issued to the vessel indicating that the vessel is in compliance with the provisions of said sections, and the rules and regulations established hereunder; except that when a foreign passenger-carrying vessel belongs to a nation which is signatory to the International Convention for Safety of Life at Sea, a valid safety certificate issued to the vessel pursuant to the Convention may be accepted in lieu of the required certificate of inspection.
Compliance
(b) Any passenger-carrying vessel to which a valid certificate of inspection has been issued pursuant to this section shall during the tenure of the certificate be in full compliance with the terms of the certificate.
Surrender; withdrawal for noncompliance
(c) A certificate of inspection issued pursuant to this section may at any time be voluntarily surrendered and shall be withdrawn and suspended or revoked for noncompliance with any applicable requirements of sections 390-390g, 404, and 526f of this title or regulations thereunder. May 10, 1956, c. 258, § 4, 70 Stat. 153.”
As stated before, the Miss Judy was required under the Certificate of Inspection to be operated by licensed operators. This was a duty owed by the employer under the above Regulations; that is, to be in full compliance with the Certificate. A licensed operator must take a physical exam in order to be qualified to receive his license. Wilson Smith was not such a licensed operator. *184 This is a clear violation of the Coast Guard regulation herein, and this violation is negligence per se.
As aforementioned, the Certificate of Inspection required aboard the vessel at all times not one, but two Ocean Operators and two deckhands, except when operating not more than twelve hours in any twenty-four period. This vessel never operated with more than two crew members. Evidence in the record indicates that at times additional crew members were needed. We find this to be an additional violation of regulations and therefore negligence on defendants’ part.
However, more is required to hold defendants liable in this case. It must be shown that the negligence, which has been proved, actually caused or contributed to the injury which plaintiff sustained. We find that this negligence was indeed a contributing factor to plaintiff’s stroke. Doctor Clark testified as follows:
“Q. ... In your opinion, did that duty that he had out at sea play any part in bringing about his cardiovascular accident on February 28th, 1974?
A. Well, I said that I wouldn’t pass him in the physical in ’71 because of his blood pressure, nor actually because the heart problem before he had the tachycardia as a captain on the vessel. The blood pressure you have being elevated, being on the water, and the marine thing is very stressful type condition over a period of time. There’s many factors that contribute to any type of stroke or heart attack, and several factors, stress is one of them, obesity, hypertension, cholesterol . we know that they’re going to be doing the type work, you know, that they're under a constant stress, and that is why I examine for so many companies ... he, due to the stress and his physical condition and the work load involved, he should not have been in the Gulf.
Q. You think this is a contributing factor so far as—
A. Yes. Everything I’ve mentioned is a contributing factor.
Q. Was this duty in the Gulf a contributing factor?
A. Yes, the stress of it, plus the others.”
It is obvious that Doctor Clark believed the stress and strain of plaintiff’s job contributed to his disease. There is also testimony by other sea captains that work in the Gulf of Mexico was exceedingly stressful at times; that high seas were often encountered as were rough winds; and that the strain of being on call often twenty-four hours a day was very stressful. We find that this and other evidence was a sufficient basis upon which the jury could make its finding.[1]
QUANTUM
Mr. Smith married his wife in 1952. On the date of his injury he was 58 years old. They have eight children, five of which are living at home. The youngest child is 7 years of age. Mr. Smith’s earnings for the year 1972 was $10,464.80. In the following years he maintained this ap *185 proximate earning level. His life expectancy was sixteen years from the date of the accident. The jury awarded $150,000.00 to Mr. Smith for pain, suffering, loss of wages, permanent disability, and medical expenses, both past, present, and future. As aforesaid, plaintiff’s stroke caused permanent brain damage and his ability to speak is severely impaired. He is unquestionably totally and permanently disabled. We find no error in this award.
In these Jones Act cases contributory negligence is applied to mitigate damages. See the Jones Act, 46 U.S.C.A. § 688. It can be argued that plaintiff’s failure to disclose his illness to his employer amounted to contributory negligence. See Mroz v. Dravo Corporation, 429 F.2d 1156 (3 Cir. 1970). The jury was instructed as to contributory negligence, and could have found that plaintiff was in good faith in not making this disclosure. Alternatively, the jury might well have taken into consideration plaintiff’s failure to disclose when deciding quantum.
For the above and foregoing reasons the jury award is affirmed, costs to be assessed against defendants-appellants.

AFFIRMED.

GUIDRY, J., dissents and assigns written reasons.

. In addition to the matters discussed in the body of this opinion, defendants cite the refusal of the judge to submit the case to the jury on special interrogatories as error. However, defendants admit and we agree that there is no legal requirement in either federal or state courts to give special interrogatories to the jury. Therefore this assignment of error is without merit.
Defendants cite as error the following jury charge:
“It is not a valid defense to a suit like this one to contend that the injured seaman assumed the risk of his employment if the injury resulted in whole or in part from negligence of the employer, its agents, employees or servants.”
They argue that assumption of risk was not pleaded or argued and that this charge would only confuse the jury. However, in DeLima v. Trinidad Corp., 302 F.2d 585 (2nd Cir. 1962), the court held that where assumption of risk is not pleaded as a defense and is not at issue, the court should honor the plaintiffs request to charge that the assumption of risk doctrine is not applicable to plaintiff.