**Timothy COURVILLE**

v.

**CARDINAL WIRELINE
SPECIALISTS, INC.**

**Civ. A. No. 89–1511–LC.**

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Oct. 15, 1991.

---

Nick Pizzolatto, Jr., Lake Charles, La., for plaintiff.

Allen L. Smith, Jr., Lake Charles, La., for defendant.

## RULING

TRIMBLE, District Judge.

This matter was tried before the undersigned on August 8, 1991, the plaintiff seeking damages for an injury sustained by him on March 22, 1989 while descending a ladder/stairway from the wheelhouse down to the galley of the JoMac 8, a 3-legged lift vessel owned and operated by Cardinal Wireline Specialists, Inc. Mr. Courville was a wireline helper and deckhand assigned to this boat, which was operated by a two man crew. The other crew member was Mr. Courville's superior, Steve Arnold, the boat captain and wireline operator. The parties stipulated that plaintiff, at the time of the alleged accident, was a seaman within the meaning of the Jones Act (46 U.S.C.App. § 688). Plaintiff's claims are predicated on theories of negligence on the part of the employer under the Jones Act and unseaworthiness of the vessel. Although plaintiff's wife and minor child were joined as parties plaintiff, counsel for plaintiff conceded that under recent jurisprudence they have no claims individually against the defendant. Defendant Cardinal denies any negligence or unseaworthiness giving rise to liability on its part, and alternatively alleges contributory negligence of Mr. Courville in reduction of his claim.

## SUMMARY OF PERTINENT EVIDENCE

Mr. Courville testified that he had worked on this same boat from July, 1988 until just before Christmas of 1988, when the boat was transferred to New Iberia. At that time he was an employee of Schlumberger, in the Wireline Division, doing the identical work that he subsequently performed for Cardinal. When he first went to work for Schlumberger, Mr. Courville applied non-skid tape to the steel stairway from the galley to the wheelhouse. The treads had little "chicken feet" or raised areas to help create a non-skid surface, but the stairs were still slippery until the tape was applied.

During early January of 1989, Mr. Courville worked offshore "catching jobs" for about two or three weeks, and he was not working on the JoMac. Toward the end of January, 1989 the boat was sent back from New Iberia to Galveston, at which time he was reassigned to it and discovered that the non-skid tape had been removed from the stairway. Because of the slippery condition on the stair steps, both he and the skipper, Steve Arnold, asked Alan and Paul Langley for non-skid tape for the treads. According to Mr. Courville, this occurred on more than one occasion, and one time another employee, Dennis Vidrine, was present. The conversations concerning the tape took place in the Cardinal office on Opelousas Street in Lake Charles. Alan Langley was the Lake Charles district manager, and Paul Langley was a salesman. Both plaintiff and Steve Arnold testified to the general state of disrepair of the boat, but the testimony made it clear that the only possible neglect relevant to this case had to do with the failure to furnish a non-skid surface for the treads of this particular stairway.

On March 22, 1989, Mr. Courville and Mr. Arnold drove from Sulphur to where the JoMac was docked in Galveston, arriving there about 6:00 A.M. Courville went directly up the stairs in question to the wheelhouse, checked things there, and then started down the stairs. Mr. Courville testified that he was descending, facing forward, and was holding the handrail which was to his left. When he was about halfway down, his right foot slipped, causing him to fall a distance of 4 to 4½ feet to the floor of the galley. He attempted to stop his fall by grabbing the railing and going stiff legged. When he landed, it felt as though his weight went to the inside, and he knew that his knee was hurt immediately. There was swelling in the joint, and he called to Steve Arnold for help. Mr. Courville's testimony was that the stairway was inside, it was dry, and he was not aware of any foreign matter on the stairs. The only complaint with the stairway, then, relates to the fact that it was quite steep, as illustrated in the photographs, and that the steel surface, even with the "chicken feet",

without further non-skid coating, was slippery. Mr. Courville testified that he was wearing the standard steel toed work boots that all other workers wore.

Following the accident, Arnold assisted Courville in getting to the truck as Courville could not put any pressure on his right leg. They started back toward Lake Charles, but there was a constant pain in his knee as though he was being stabbed, so they stopped at St. Elizabeth Hospital in Beaumont. An emergency room doctor X-rayed the knee and put it in a brace to immobilize it. The physician stated that he needed to see a specialist. The doctor did give him a pain pill, but plaintiff could not remember whether he gave him a prescription for pain. The pain continued about the same until they arrived in Lake Charles. They had obtained some crutches from the hospital, which he used to walk into the office. Arnold called Dr. David Drez, an orthopedist in Lake Charles, and made arrangements for the doctor to see him. Arnold took him home, and from there his wife took him to Dr. Drez's office. Meanwhile, the pain had worsened. Dr. Drez drained the knee of fluid with a needle, which relieved the pain somewhat. Dr. Drez prescribed therapy. Mr. Courville testified that he did not get a prescription for pain because he has ulcers and could not take oral pain medication. After three or four days of physical therapy, he returned to Dr. Drez, who had him admitted to Lake Charles Memorial Hospital for arthroscopic surgery of the knee. He was in the hospital for two days, was released, and then saw Dr. Drez about two days later for removal of the stitches. He was placed on a machine that flexed his leg. He took this machine home with him and used it for several months. He also started physical therapy within a few days after the operation and continued that for several months. When walking, he utilized a stiff-legged brace. The pain was still bad, but not as severe as it had been before the operation. He was on crutches for about three or four months, and he even slept with the machine that moved his leg.

Mr. Courville claims that he still has pain in his right knee. It feels like something is under the kneecap, and he feels a locking in the knee. There is also a popping and grinding in the kneecap. Occasionally, the pain will keep him awake at night. However, he admits there is no comparison between what the pain is now and what it was immediately after the accident, when it was excruciating. He is on no medication for pain because of his stomach condition. He did testify that pain injections do not irritate his stomach, and he also stated that he has not been treated for his ulcers since 1980 or 1981, when he spent eight days in the hospital. He said that he has problems with his right leg giving out, causing him to fall. Several months prior to the trial, he fell down the steps when this occurred, and a second surgery was performed. He has fallen a total of three times since his first operation. At the second surgery, Dr. Drez found that the knee joint was tight but noted some weakness in the quadriceps muscles. He finds that he has some aching when the weather changes.

Mr. Courville described an active recreational life, including hunting deer, duck, and squirrel. He states that he cannot walk the marsh, which is how he had hunted duck, nor can he climb a deer stand or walk on uneven ground. He states that he cannot walk very far.

Mr. Courville further testified that he used to fish, primarily for bass and perch. He admits that since the accident he has bought a campsite, and his friends built a camp for him. He helped a little, and he stated that he fished every chance he got. It was about a year following the accident when he resumed fishing, and he said that he has to sit down to fish now rather than stand up.

Mr. Courville claims that he also used to swim, tube, canoe, and water ski. He also did some snow skiing, but he can neither water ski nor snow ski now. He has done some swimming for therapy.

He has moved his family from a house in the country where he had a horse because he could not cut the grass or care for the horse. He used to ride a lot, but he has not ridden since his injury because he is afraid that the horse might shy away. On further examination, he admitted that he has gone snow skiing only once in his life. He now lives in a house with a smaller yard and uses a riding lawn mower. Before the accident, he enjoyed dancing, including fast dancing, but now he can only slow dance a little. He cannot kneel or crawl because of pain in his kneecap. He states that his family life has changed in that his temper flares, he is high strung, and he cannot ride the horse with his daughter, or "roughhouse" with her as he used to do. He is nervous, and this adversely affects his sleep. He is worried about his future and has borrowed money to live on. He has been receiving maintenance, up to the date of trial, from his employer. Mrs. Courville had gone to work a few months before the accident, and she is still employed by the Calcasieu Parish School Board as a cafeteria worker.

Mr. Courville has made no attempt whatever to find a job of any kind, his explanation for this being that he had not been "released" from the doctor's care. However, he had been told by the doctor that he had reached maximum medical recovery. He stated that he would have to try to go to school or get an office job of some kind.

On cross-examination, Mr. Courville admitted that he did not consider himself an invalid or totally disabled from doing any kind of work. He simply admitted that he had not tried to do any type of work. He further admitted that Dr. Drez had told him on July 25, 1990 that he had reached maximum medical recovery and needed to re-train, and gave as his only excuse for not doing anything about getting back into the work force the fact that he had not received a release form. He admitted that there was brown paint on board the JoMac, but he denied knowing how to make a surface skid resistant by sprinkling sand over a freshly painted area. He testified that Glenn Hebert had recommended that he attend a vocational-technical school or college, but he has done nothing about following that advice. He had no interest in going to college before, but he may have

to attend college now. He has thought about going into sales or some type of business for himself. It was established on direct examination that he had prior experience driving a delivery truck for Standard Supply, had worked for the Iowa Police Department, and for the Calcasieu Parish Sheriff's Department for a time, and had also operated a bar and night club for about 8 months.

Dennis Vidrine was a wireline operator and boat skipper who worked with the plaintiff. He also went to work for Cardinal after the Slick Line Division had been purchased from Schlumberger. Mr. Vidrine testified that he worked on JoMac 8 with Courville when Schlumberger owned it. He testified that he was present on one occasion when Steve Arnold and the plaintiff requested non-skid tape for the stairway on the JoMac 8. Vidrine stated that there was no non-skid tape on the steps when he had last worked on it. On other Cardinal boats, however, non-skid tape was on the steps. Vidrine also stated that the paint and sand mixture does not provide much skid resistance. Mr. Vidrine stated that all the ladders on the boats were steep. He had no problems going down stairs on the JoMac 8, which did not have non-skid tape when he worked on it, but he has had problems going down similar stairs on other Cardinal boats. He testified that the skipper was responsible for the overall condition of the boat. The helper does most of the labor, but the skipper determines what is needed in the way of repairs and makes requests for material to be used from the supervisory staff. While he felt that more than two men were needed on a boat, he admitted that a two man crew is standard in the industry. He could not recall what response Alan Langley made to the request for non-skid tape.

Steve Arnold now works for Production Wireline Services in Jennings as a wireline operator. He had worked for Schlumberger for about 11 years, and then worked for Cardinal for 8 or 9 months. He was on the JoMac 8 working for Cardinal the first part of 1989. He was working out of the Lake Charles division, and Tim Courville was his helper. He picked up Courville on the morning of March 22, 1989, and they arrived at JoMac 8 in Galveston between 6 and 6:30 A.M. Tim went to check the wheelhouse while Arnold went to the tool area. About 6:30 or 6:45 A.M., Tim called him into the galley, and he found him lying on the floor at the foot of the steps. He advised that he had been going down the stairs from the wheelhouse and fell. He helped Tim up and looked at his right knee, where he noted apparent swelling. He recounted the trip from Galveston to Lake Charles, with the interim stop at St. Elizabeth Hospital in Beaumont, much the same as the plaintiff. Mr. Arnold testified that the stairs did not have a non-skid surface, and that it was common in the industry that things that were used for climbing were provided with a non-skid surface. He, as the skipper, was responsible to see that appropriate material was requested, and either he or the helper would put it down. Ultimately, it was his responsibility to see that the stairs were made safe. He stated that he had ordered non-skid tape before Tim's accident, but he did not receive it until after. The first time it was requested was early or mid-January. He noted the absence of the non-skid tape when he inspected the vessel right after being assigned to it. This is routine with him. Mr. Arnold testified that he requested not only non-skid tape, but a non-skid paint additive for the deck and paint in general for cosmetic use on the boat. The only material that he received was the tape after Tim's accident. He stated that he requested the non-skid tape at least twice before the accident. He stated that he had made the request of Paul Langley, the district salesman for Cardinal. Arnold testified that he had surgery on his left knee in 1972 because of torn ligaments and cartilage, and as a result thereof received a medical retirement from the Marine Corps. In February of 1976, following a fall off a gin pole while working for Otis Engineering, he again had surgery to correct torn cartilage and ligaments. Arnold testified that the skipper handles customer relations, operates the boat, runs the wireline, and is generally responsible for the upkeep

of the vessel. The wireline helper does about everything else. Because of his knee problems, he is limited in climbing and stooping. He has a 55 percent permanent partial disability of his left leg, and he testified that he could not work as a helper, though he has been able to continue to work as a wireline operator.

On cross-examination, Arnold testified that there was brown paint on the boat, but there was no sand. He had requested some sand, but that had not been furnished. He advised that he was not responsible to bring material for the boat from his home. Tim Courville had advised him that the steps on the stairway of the JoMac 8 were slick. He had also personally had some problem with the steps, though he had never actually fallen. Because he is taller than Tim, he was able to hold onto the headway on the way down. Tim had proper footwear for his job as a helper when the accident occurred.

Professor Jan Duggar, who teaches finance at U.S.L., prepared a report which was introduced into evidence concerning loss of income, past and future. The information regarding earnings communicated to Duggar was that Courville earned $5.70 per hour, 15 hours per day, 5 days a week, and sometimes 7 days on and 7 days off. Additionally, there were fringe benefits, which the witness estimated at 11.4 percent of earnings. Professor Duggar testified that he assumed, in his calculations, that Mr. Courville worked full-time with overtime. Certain modifications were required from the written report because the date of trial was delayed from March, 1991 until August, 1991. Additional calculations were made, appearing on plaintiff's exhibit 5, at the request of plaintiff's counsel, on actual earnings from Schlumberger and at the request of counsel for defendant on actual earnings from Cardinal. These figures speak for themselves and need not be reiterated here.

The testimony of Dr. David Drez, submitted by deposition, establishes that on April 4, 1989, he performed arthroscopic surgery to correct slackness in the right knee and to repair a tear of the cartilage on the lateral side of the knee. The torn ligament in the knee was reconstructed by taking a portion of the tendon of the kneecap and grafting it to serve as a substitute for the ligament. There were no complications following the surgery, and he was continued on routine follow-up examinations until January 22, 1990. Because of continued complaints of pain in the knee and no further rehabilitative progress, Dr. Drez suggested on that date that the knee be re-arthroscoped to see if there was anything wrong. The doctor testified that he could not explain these symptoms on the basis of his examinations. On January 23, 1990, the doctor performed another arthroscopic procedure. This revealed excellent stability of the knee with no arthritis apparent and no loose body in the joint. The area of the graft was well supplied with blood vessels and was stable. The doctor found no abnormality in the joint but did remove a screw which had been inserted at the initial operation because it was causing a little irritation.

Dr. Drez was extremely thorough, even having a neurologist test him for muscular dystrophy because he advised that a family member had that disease. The neurological examination was normal.

On March 14, 1990, Mr. Courville complained to Dr. Drez about pain in the knee with some popping, but with no catching, and swelling of the knee with activity. There was also a complaint that the knee gave way on him, and that he felt some grinding in the kneecap which would prevent him from squatting and caused him pain on climbing stairs. On examination, the doctor found a slight limp, with excellent motion in the knee and no difference in thigh circumferences. The doctor did detect a mild degree of grinding in the kneecap, but there was excellent stability in the knee. A Cybex test for muscle weakness revealed that muscle around the knee on the right was approximately 50 percent weaker than on the left. The doctor felt this was probably pain inhibition, meaning that pain prohibited him from performing the test to maximum effort. On April 18, 1990, the strength deficit had diminished by about 20 percent, with complaints being

about the same otherwise. Dr. Drez last saw plaintiff on July 25, 1990 and explained to him that he had reached maximum medical improvement and told him it would be to his advantage to find some other occupation besides oilfield work in view of his complaints. Dr. Drez testified that Mr. Courville would be expected to have some weather-related discomfort in the knee, and he has detectable weakness in the knee. He has a greater risk than the normal person for developing arthritis over a 10–20 year period. He assigned him a permanent partial impairment to the right lower extremity of 35–40 percent, which translates to a 14–16 percent impairment of the body as a whole. Dr. Drez's testimony, which was taken on April 3, 1991, was that he had not seen the plaintiff since July 25, 1990. While the doctor stated that Mr. Courville would not be effective in climbing stairs, carrying heavy loads, and he would not be able to go back to the heavy manual labor he had previously performed, "he is certainly not totally disabled by any stretch of the imagination."

The parties stipulated that if David Qualls, a physical therapist who worked with the plaintiff, were called to testify, he would state that the plaintiff had cooperated with his rehabilitation program.

Glenn Hebert, a vocational rehabilitation expert, testified for defendant. His report was entered as defendant's exhibit 4. This reveals that Mr. Courville has in fact had approximately one year instruction in small appliance repair and that he was trained as an electrician's mate while in the United States Navy. Testing by Mr. Hebert revealed that the plaintiff was reading at the tenth grade level, and that he demonstrated competence in spelling and arithmetic at the ninth grade level. IQ test revealed him to be of average intelligence. He functions at a higher intelligence level than the normal individual who performs labor work, and the tests show that he has the capacity to work in office environments that require reading, taking messages, completing forms, using technical manuals, following detailed written instructions, and performing mathematical calculations beyond simple addition, subtraction, multiplication, and division. He has the capacity to complete vocational-technical school requirements in the courses of instruction in electronics, computer maintenance, computerized-aided drafting, and computer operations. Further, he demonstrated the ability to complete office skills occupation courses. These courses last an average of 18 to 24 months. Mr. Courville expressed to him some interest in returning to school for some retraining, and if he attended the state supported vocational-technical school in the Lake Charles area he would spend an average of 18 to 24 months in training and, and if could not obtain financial assistance, the cost would run between $2,000.00 and $3,000.00. If he had to purchase his own special tools, they would cost about $1,000.00 additional. In fact, he is eligible for assistance, which would pay all tuition, books, and supplies, plus $5.00 per day subsistence. The jobs for which he would become qualified through this retraining would all pay in excess of the $5.70 per hour that he was earning, and would actually pay in the $6.25 per hour category, or more.

At private schools such as Delta or Clark, a two year course would cost him between $5,000.00 and $6,000.00. At McNeese, a two year associate degree in electronics, computer operations, or computer-aided drafting would cost about $15,000.00, including books, tuition, material, parking and meals. With the skills acquired in this program, he should be able to begin work earning between $1,400.00 and $1,500.00 per month.

Mr. Hebert also testified that while Mr. Courville's intelligence was average for the nation, he is higher than the Louisiana average.

Defense exhibit 1 is a letter from the controller of Cardinal Wireline showing that Mr. Courville earned $9,118.33 from July 5, 1988 to December 31, 1988, while employed by Schlumberger. From January 1, 1989 through the date of the accident, March 22, 1989, he earned $3,446.83 while employed by Cardinal.

The deposition of Mr. Alan Langley disclosed that he was the former manager of Cardinal Wireline at the Lake Charles district office beginning in January, 1989. He was familiar with the stairways on the JoMac 8, which he described as being very steep and narrow. They were made of iron, and when Schlumberger had the boat, they had non-skid tape on the treads. He recalled that Steve Arnold had asked him for tape, but he did not remember when it was. He contacted the safety director and obtained some tape and gave it to Arnold. He could not recall whether this was before or after the accident. His testimony was that he *thought* he received the tape before the accident, but he was not sure.

Paul Langley likewise testified by deposition. He did not recall being asked for any non-skid tape.

## ANALYSIS OF LAW AND FACTS

### A. *Unseaworthiness*

■ The law is clear and settled that a vessel owner has an absolute duty to furnish a seaworthy vessel, that is a vessel and appurtenances which are reasonably safe and fit for their intended use. *Ceja v. Mike Hooks, Inc.*, 690 F.2d 1191 (5th Cir. 1982). Photographs introduced into evidence clearly depict the stairway in question to be very steep and narrow as described by Alan Langley in his deposition. Even with the raised "chicken feet" plaintiff, Arnold, and Vidrine all described the surface of the treads of the stairway as being slippery without the non-skid tape. Non-skid tape had in fact been in use on the vessel when it was owned by Schlumberger, but for reasons unexplained it was removed and not reapplied until after Mr. Courville's mishap. No one testified that the steps were not slippery. In fact, Mr. Arnold testified that he had a problem with the steps but held onto the headway in descending, as he was taller than Courville. The use of the non-skid tape or some other skid resistant surface was apparently customary in the industry. Mr. Vidrine testified that the other Cardinal boats had non-skid tape on the stairway. This boat had had it when it was owned by Schlumberger.

Based upon the evidence in the case, the court concludes that the vessel JoMac 8, owned and operated by Cardinal Wireline Services, Inc., was, on March 22, 1989, at the time of plaintiff's accident, unseaworthy because of the absence of non-skid tape or some other appropriate skid resistent surface on the steep steps between the galley and the wheelhouse.

### B. *Negligence Under the Jones Act*

■ A vessel owner will be deemed negligent if he fails to exercise reasonable care to maintain a reasonably safe work environment. *Ceja v. Mike Hooks, Inc., supra.* Evidence by way of testimony of plaintiff, Arnold, and Vidrine establishes to the court's satisfaction by a preponderance of the evidence that the unsafe condition of the stairs persisted from the first part of January, 1989 until March 22, 1989 when the accident occurred. Even if the condition had not been called to the attention of Cardinal management personnel, more than adequate time elapsed for management to have discovered the inadequacy and had it remedied. The court finds, however, that both Courville and Arnold made Alan and Paul Langley, who would have had authority to obtain the non-skid tape, aware of the situation and requested the material. This is really not a matter of making credibility choices. Courville, Arnold, and Vidrine testified positively to that effect. Alan Langley was extremely vague about when the tape was requested, and could not say whether it was before or after the accident. Paul Langley could not recall being asked for the tape, but he did not deny that such a request was made. In this situation, the positive testimony of the three witnesses preponderates to the effect that on more than one occasion, over a period that extended from sometime in January, 1989 until March 22, 1989, requests for the tape were made of management without response. Failure to remedy this defective condition of the stairway constituted negligence under the Jones Act.

The court notes that defense counsel was quite candid in his pretrial memorandum on this issue of liability, stating the following:

"If the court believes that the non-skid material was removed from the steps by some Cardinal employees in New Iberia and that the Langleys refused or failed to supply non-skid material after requests by Courville and Arnold, then there seems to be little question that Cardinal Wireline Services is not only guilty of negligence under the Jones Act but that the vessel JoMac 8 would have been unseaworthy."

The court does not know who removed the non-skid tape, but is convinced that it was removed sometime after the boat was taken to New Iberia and before it was returned to Galveston. Thereafter, the court is convinced that well in advance of this accident, Alan and/or Paul Langley had been advised of the slippery condition of the steps and requested to furnish non-skid tape.

### C. *Contributory Negligence*

■ As pointed out in *Ceja v. Mike Hooks, Inc., supra,* in contrast to the broad duty imposed upon a vessel owner to supply a safe work place, the seaman's duty to protect himself is slight. However, contributory negligence is available to mitigate a vessel owner's liability according to comparative fault, when an injured seaman has been negligent in breaching a duty to act or refrain from acting. A seaman is not contributorily negligent merely because he uses an unsafe tool or appliance or proceeds in an unsafe area of the ship. Only where it is shown that there existed a safe alternative available to him of which he knew or should have known, can a seaman's choice of an unsafe course of action be properly considered in determining whether he was negligent. Applying the foregoing statement of the law to the facts of this case, we had a stairway known to the plaintiff to be slippery. He had called the slippery condition to the attention of his immediate superior (Arnold) and to the Langleys. At the same time, the stairway was not by any means impossible of negotiation. Although Mr. Arnold steadied himself by holding onto the ceiling overhead, he walked down the steps without mishap even though he had a 55 percent disability

of his left leg from two prior accidents and surgeries. The plaintiff himself had negotiated this stairway from January until the latter part of March without falling.

On the date of the accident, according to Courville's own testimony, there was no foreign substance in the way of water, grease, or otherwise, on the stairway. This was a routine workday, and the plaintiff was not being hurried in any way. He had nothing in his hands, and he claims to have been holding onto the rail with his left hand as he came down in the forward position.

Even though the cases indicate that a seaman's obligation to protect himself is slight, it is certainly not nonexistent. Counsel for plaintiff, in his pretrial memorandum, refers to the stairway as a "ladder/set of stairs." A photograph, in the opinion of the undersigned, shows this so-called stairway to be far more accurately labeled a ladder. The court finds that there did in fact exist a very obvious alternative which should have been quite apparent to the plaintiff, *i.e.,* simply to use the stairway as a ladder, knowing that it was slippery and that the non-skid tape had not been applied to the treads. He could simply have gone down the ladder backward, holding onto the rail with his right hand. This would have been slightly slower, perhaps, but there is no evidence of any need for the plaintiff to have been in a hurry and no prohibition by his superiors against so utilizing the "stairway." The court feels that the plaintiff's own negligence or fault in the circumstances of this case contributed 15 percent to his injury, and the judgment herein will so reflect.

In passing, the court heard testimony about an option available to the crew of applying paint to the stairway and sprinkling it with sand. The paint was available on the vessel, but there was no sand. The court has been referred to no law or custom requiring crew members to furnish, at their own expense, and initiative, material to render a vessel seaworthy. The court ascribes no fault to Mr. Courville in that connection.

## D. *Damages*

■ As noted by Professor Duggar, Mr. Courville was approximately 29½ years old at the time of his injury. He is left with a 35 to 40 percent impairment of the right leg, according to Dr. Drez. The nature of his injury is such that he will not be able to engage in heavy manual labor, which is the type work that he had elected to perform. He was apparently quite active physically in his recreational life prior to his accident. Without question, there will be some significant restrictions on his future activities. He also will be more likely than the average person to develop arthritis in the affected knee.

The above having been said, the undersigned did not feel that Mr. Courville was totally ingenuous in his testimony as it pertains to damages in this case. Although he testified that he enjoyed snow skiing, it developed that he had only been snow skiing once in his life. In view of the fact that Mr. Courville is married and is by now probably the father of two children, considering his income as reflected in the letter from the Cardinal controller, it is doubtful that he would have engaged in snow skiing to any great extent. The court is aware of the expense involved in this particular activity. He also advised that he could not duck hunt any longer because it was his method of hunting to walk along the marshes. The court is likewise aware that thousands of hunters ride boats to duck blinds, where they sit and wait for the ducks to appear. If this is one of Mr. Courville's avid pursuits, there is no reason why he could not continue it with a slight modification. People with physical impairments from disease, injury, or congenital anomalies can and do make remarkable adaptation to their incapacities. The writer recently watched a program which featured in part video tapes of a young paraplegic playing tennis in a wheelchair with amazing skill and agility.

It is likewise noted that because of Mr. Courville's continued complaints of pain and weakness in the knee, in spite of the fact that there was nothing evident to indicate the cause of the problem, Dr. Drez performed a second arthroscopy. Through this, he found no vascular problem and no problem whatsoever with regard to stability of the knee. Neurological testing was totally normal. Measurements of the right thigh shows that it is equal to the left, which to the undersigned would indicate rather normal usage of the extremity despite Mr. Courville's protestations of discomfort. Dr. Drez never mentioned any wasting of the musculature of the right knee or leg. The strength test that he administered admittedly had a strong subjective component, but Dr. Drez stated that Mr. Courville may not have exerted maximum effort because of pain limitations. His assessment of disability was made on the basis of the demonstrated weakness. The court notes that Mr. Courville, following his injury, has purchased a campsite and assisted somewhat in building a camp thereon. The camp is located on a lake, and the court cannot conceive of Mr. Courville making this type of investment without an intention of making rather extensive use of it. In fact, Mr. Courville says that he resumed fishing about a year after his accident, but he simply cannot stand up and fish.

Having observed Mr. Courville and considered his testimony and the testimony of Dr. Drez, this court feels that Mr. Courville will in fact make adjustments in the manner in which he pursued many of his prior activities so as to permit him to engage in them, but perhaps not as vigorously and for not as extended a period of time. Nevertheless, Mr. Courville suffered apparent severe pain immediately following the injury and for sometime thereafter. He was forced to utilize a stiff-legged brace, to undergo two surgical procedures, and to be placed on a machine for two or more months that moved his leg involuntarily in order to avoid loss of motion. He is going to be forced to pursue employment not of his voluntary choosing, and he will not be able to engage in activities that involve climbing, squatting, or running on uneven ground. His disability comes during the prime of his life, when he could have looked forward to many years of enjoying a very physically demanding recreational

life. All circumstances considered, the court feels that an award of $175,000.00 for Mr. Courville's pain, suffering, disability, and loss of enjoyment of life, past, present, and future, is appropriate for general damages.

■ The only other item of damages involves loss of income. The court cannot accept Professor Duggar's computations based upon an assumption that Mr. Courville would work full-time and overtime 15 hours per day and from five to seven days per week on a steady, uninterrupted basis. The only direct earnings information belies such an assumption. Neither can the court accept the invitation of defense counsel to simply utilize the approximately 2¾ months when the plaintiff was employed by Cardinal Wireline Services as a base line for lost income. It would be logical that the winter months, because of inclement weather, would afford less work opportunity than other times of the year. In an effort to stay within the framework of the evidence presented to the court, the undersigned elects to use an average of the 8¾ months earnings immediately prior to the accident reflected in the letter of April 12, 1991 from the Cardinal controller. The combined total of Schlumberger and Cardinal earnings from July 5, 1988 through March 22, 1989 amounted to $12,565.16. This, divided by 8.75 months, would reflect average monthly earnings of $1,436.02. It is from this figure that loss of earnings will be computed.

This court cannot and will not, from the evidence, conclude that it is just and proper to project loss of earnings for Mr. Courville throughout his work life expectancy as a wireline helper. Mr. Courville's attitude toward returning to the work force, as expressed in his testimony, was most unimpressive. He admitted quite frankly that he understood as of July 25, 1990 that he had reached maximum recovery, and that he would have to make some kind of career

choices. For some unexplained reason, the company continued to pay him maintenance, and Mr. Courville simply did nothing whatsoever about pursuing some type of career within his physical capabilities. Mr. Courville is an articulate young man who appears to be of at least average intelligence. This is borne out by the testimony of Mr. Hebert. He is definitely a candidate for training in some type of skill which would enable him to keep much better hours at his work than getting up at 4 o'clock in the morning to be in Galveston by 6 or 6:30 A.M., and thereafter work perhaps 15 hours before returning home. He would also be able to make more money than he has been making, according to Mr. Hebert's unrefuted testimony. The court cannot accept Mr. Courville's excuse that he had not been given a "release" form, and therefore he was entitled to simply sit back and do nothing career-wise for an indeterminate period in the future.

With regard to loss of wages, the court will award sixteen months, from March 22, 1989 through July 25, 1990, at $1,436.02 for a total of $22,976.32. In accordance with the testimony of Mr. Hebert, who said that Mr. Courville could obtain an associate degree in electronics, computers, or some other skilled field by taking a two year course, and thereafter earn $1,400.00 to $1,500.00 per month, the court will award an additional 25 months at $1,436.02, for a total of $35,900.50. Additionally, Mr. Hebert felt that the cost of obtaining an associate degree from McNeese, which would be the best option, would amount to a total of $15,000.00, and the court will allow that amount. This should adequately compensate Mr. Courville for lost income, and in addition, leave him equipped to function as a skilled technician with the ability to work regular hours and advance in accordance with his ability and initiative. The total award will be reduced by 15 percent for Mr. Courville's contributing negligence.

To summarize, damages will be awarded as follows:

| | |
|---|---|
| General Damages | $175,000.00 |
| Loss of Income (3/22/89–7/25/90) | 22,976.32 |
| Loss of Income (7/25/90–8/25/92) | 35,900.50 |
| Cost of Associate Degree from McNeese | 15,000.00 |
| TOTAL | $248,876.82 |
| Less 15% | 37,331.52 |
| TOTAL AWARD | $211,545.30 |

### E. *Interest*

In awarding interest, the court again looks to guidance from *Ceja v. Mike Hooks, Inc., supra.* In that case, the court held that prejudgment interest should be awarded in admiralty cases not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled. The court is given discretion to deny prejudgment interest only when there are "peculiar circumstances" making it inequitable to require defendant to pay prejudgment interest. The court finds no such peculiar circumstances in this case. The fault of the employer and vessel owner in this case far outweighed the fault of the plaintiff, and interest will be allowed from July 3, 1989 at the legal rate. This is in keeping with *Ceja*, where liability was predicated upon both Jones Act negligence and unseaworthiness.

Judgment will be rendered in accordance with the foregoing.

THUS DONE AND SIGNED.