663 So.2d 137 (1995)
Edward D. MILSTEAD, Plaintiff-Appellee,
v.
DIAMOND M OFFSHORE, INC., et al., Defendants-Appellants.
No. 94-1582.
Court of Appeal of Louisiana, Third Circuit.
September 6, 1995.
Writ Granted December 15, 1995.
*140 Elwood C. Stevens Jr., Morgan City, for Edward D. Milstead.
Cliffe Edward Laborde III, Dean Anderson Cole, Lafayette, for Diamond M Offshore, Inc. et al.
Before DECUIR, AMY and SULLIVAN, JJ.
AMY, Judge.
This matter arises from an offshore injury sustained by plaintiff, Edward D. Milstead, while on a vessel owned by defendant[1]. We find no manifest error on the part of the trial court and affirm its ruling as amended below.

PROCEEDINGS BELOW
On September 8, 1992, Edward Milstead was working as a floor hand aboard a semi-submersible offshore derrick owned by defendant. Plaintiff was injured when his head was struck by a falling drill line while extending his upper torso and head through two handrails during a "cutting and slipping" operation. On June 11, 1993, plaintiff filed suit in Iberia Parish seeking to recover under the Jones Act and general maritime law for past, present, and future medical expenses; general damages for pain and suffering; mental anguish, distress, and emotional upset; special damages for loss of income and impairment of earning capacity; and maintenance and cure.
After a four-day bench trial, the trial court found that defendant had breached its duty as a vessel owner under the general maritime law to provide a seaworthy vessel, a competent crew, and the necessary equipment to perform the functions of the rig. The trial court also found that defendant, as plaintiff's employer, was negligent under the Jones Act. Although the trial court noted that plaintiff had a duty to perform his job duties in a non-negligent manner and found that he had reached through a handrail without wearing a safety harness contrary to defendant's safety rules, the trial court determined that plaintiff's failure to wear a safety harness did not cause his injuries. Consequently, the trial court determined that the unseaworthiness of defendant's vessel and defendant's negligence solely caused plaintiff's injuries and that plaintiff was not comparatively negligent.
The trial court found that plaintiff had suffered injuries to his lower back, neck and head and an aggravation of a preexisting injury to his knees. The trial court awarded plaintiff $953,536.40 for past and future economic loss because the trial court found that plaintiff was unable to return to gainful employment. The trial court also awarded $150,000 for past and future physical pain and suffering and an additional $150,000 for past and future mental pain, anguish and loss of enjoyment of life. The trial court further found that plaintiff had not reached maximum medical cure and that defendant was obligated to continue providing cure until plaintiff reached maximum medical cure.
The trial court held that defendant was responsible for $10,084.95 in past medical expenses. The trial court found that defendant did not arbitrarily and capriciously fail to pay cure because appropriate investigation delayed payment. Consequently, the trial court concluded that defendant did not owe plaintiff penalties and attorney's fees. The trial court also determined that defendant did not act willfully and wantonly to cause plaintiff's injuries; therefore, defendant was not liable for punitive damages on the maritime claim. The final award totaled $1,263,621.30.

ASSIGNMENTS OF ERROR
Defendant appealed, listing the following assignments of error and issues for review:
1. Every medical expert testified that plaintiff is physically and mentally capable of returning to gainful employment within certain restrictions. Even plaintiff's vocational expert testified that plaintiff was employable. And yet, without revealing the basis for its decision or any assessment of the experts' credibility or qualifications, the trial court concluded that plaintiff will *141 never be able to return to work. The court erred.
2. In lieu of live testimony, the parties submitted written economic reports. Plaintiff's report did not contain the underlying facts or reasons for its conclusions, while defendant's report included the supporting facts and reasons for each opinion. The trial court erred in adopting the highest figure offered by plaintiff's economist without providing any reason for rejecting the opinions of defendant's economist.
3. Plaintiff positioned himself outside the handrail in the only place he could have been injured. The trial court held plaintiff was negligent, but found that plaintiff's actions and fault were not a cause of the accident. The trial court did not reveal the causation standard it applied. It was error for the court to find plaintiff's negligence was not the slightest producing cause of his own accident.
4. The trial court found that plaintiff had an aggravation to a pre-existing condition. However, the trial court failed to address the extent of the aggravation or how it affected plaintiff's economic and general damages. This was error.
5. The trial court awarded prejudgment interest on lump sum awards for past and future damages. It was error for the trial court to award prejudgment interest on future damages.
Plaintiff answered the appeal and asserted the following assignments of error and issues for review:
1. Whether or not a trial judge errs in failing to award any sum for future medical expenses when the evidence overwhelmingly preponderates that plaintiff has incurred substantial past medical expenses and is clearly in need of multiple future surgeries, therapies and treatments. Future medical expenses should have been awarded.
2. Whether or not a general maritime law claim for punitive damages in connection with denial of a maintenance and cure claim survived Miles v. Apex Marine [498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990)] and whether the evidence preponderates that defendant was arbitrary and capricious in denying plaintiff's maintenance and cure claim. The trial court erred in failing to award punitive damages.

THE ACCIDENT
The purpose of the "cutting and slipping" operation in which plaintiff was engaged at the time of his injury was to replace worn drill line. The drill line is wire rope weighing four to five pounds per foot that moves the drill block up and down in the derrick. During the operation, an air hoist lifts the new drill line from the drill floor into the derrick.
Plaintiff was ordered by Tommy Hale, the driller and his supervisor, to stand on the motor shed, which is located twelve to fifteen feet above the drill floor. It is surrounded by two handrails. His mission was to prevent the drill line from rubbing on the hydraulic hose as it was hoisted up.
The first time plaintiff attempted to remove the drill line from the hydraulic hose, the drill line was not far away and he was able to reach the drill line and pull it back. As the drill line continued to be lifted by the air hoist, it got closer and closer to the hydraulic hose. Eventually the drill line came to rest against the hydraulic hose. At this point, plaintiff testified that he was unable to reach the drill line from his previous position. He testified that he tried to reach the drill line by leaning his body in between the two handrails, but that he was afraid that he would fall from that position. So plaintiff sat on the bottom handrail, crossed his legs around a vertical post, held onto the handrail with his left hand, and was able to reach out and grab the drill line with his right hand. The accident occurred when the drill line fell, striking plaintiff's head as he stretched out from the handrail. Plaintiff's body "jack-knifed," and he fell backwards to the floor of the motor shed.

STANDARD OF REVIEW
Under the manifest error standard of review the trial court's factual findings will *142 only be disturbed on appeal if we conclude after a review of the record that a reasonable factual basis does not exist for the trial court's findings and that the record establishes that the trial court's findings are clearly wrong. Stobart v. State through DOTD, 617 So.2d 880 (La.1993). Defendant argues that under Bloxom v. Bloxom, 512 So.2d 839 (La.1987), the deference that Louisiana appellate courts normally accord the trier of fact's factual findings under the manifest error standard of review is not applicable in this case because the trial court failed to articulate the legal theories or evidentiary facts on which its factual conclusions were based. Consequently, defendant urges this court to conduct an independent review of the record.
Before determining whether the manifest error standard of review or the less deferential Bloxom standard of review is applicable, we must first consider whether Louisiana law supplies the applicable standard of review or if Rule 52(a) of the Federal Rules of Civil Procedure is controlling.
In Trahan v. Gulf Crews Inc., 260 La. 29, 255 So.2d 63 (1971), the Louisiana Supreme Court held that federal law governed the standard of review for suits instituted under the Jones Act and federal maritime law in the Louisiana state courts. Subsequently, this court followed Trahan and applied federal law to review the factual findings in Jones Act and maritime cases brought in the Louisiana state courts. West v. State Boat Corp., 458 So.2d 647 (La.App. 3 Cir.1984); Reed v. Seacoast Products, Inc., 458 So.2d 971 (La. App. 3 Cir.1984).
In Daigle v. Coastal Marine, 488 So.2d 679 (La.1986), the Louisiana Supreme Court was asked to consider whether Louisiana law or federal law governed the scope of appellate review with respect to jury verdicts in an Outer Continental Shelf Lands Act (OCSLA) case. The Louisiana Supreme Court held that Louisiana law, rather than federal law, supplied the applicable standard of review.
The Louisiana Supreme Court examined Trahan in Daigle and its discussion bears on the issue presently before us. The supreme court distinguished the two cases on the basis that Trahan was a Jones Act case decided under federal substantive law; whereas, Daigle was an OCSLA case with Louisiana law being the controlling substantive law. However, the Louisiana Supreme Court also suggested that Trahan no longer controlled the standard of review in Jones Act cases and general maritime law by quoting from a United States Supreme Court case that "`state courts are not required to apply Rule 52(a) [the clearly erroneous standard of review]a rule of federal civil procedureto their own appellate system for reviewing factual determinations of trial courts.'" Daigle, 488 So.2d at 681 fn.3, citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986), and by stating in the opinion that "the procedural law of Louisiana controls as to the scope of appellate review." Daigle, 488 So.2d at 682.
Since Daigle, there is a difference in this circuit over whether federal law or state law supplies the applicable standard of review.[2] We find the rationale set forth in the cases that have held that Louisiana law controls appellate review of factual findings in Jones Act claims and unseaworthiness claims brought in Louisiana state courts to be the most compelling. We further believe the Louisiana Supreme Court's recognition in Daigle of the applicability of the United States Supreme Court's opinion in Icicle Seafoods, Inc. to be particularly compelling. Finally, *143 we note that the Louisiana Supreme Court's holding in Trahan that federal law controlled the standard of review was based on an interpretation of United States Supreme Court jurisprudence which no longer seems correct in light of Icicle Seafoods, Inc.
Having determined that Louisiana law supplies the applicable standard of review, we now decide whether the manifest error standard of review or the less-deferential Bloxom standard of review should be applied. In Bloxom, the Louisiana Supreme Court held that it was unable to give the trial court's factual finding "the usual deference attributed to the decisions of triers of fact at the trial level. The trial court's reasons do not articulate the theory or the evidentiary facts upon which its conclusion is based. Nor can we infer from the trial court's reasons and the record the theory [under which the trial court made its factual finding].... [W]e may accord deference to a decision of less than ideal clarity if the trial court's path may reasonably be discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record." Bloxom, 512 So.2d at 843.
Defendant has sought review of a number of the trial court's factual determinations. In determining whether the trial court's factual findings are entitled to the usual deference under the manifest error standard of review or the less deferential Bloxom standard of review, we have considered whether each of the trial court's factual findings which we have been asked to review are "necessarily and clearly implied by the record." Upon review, we find that the "trial court's path may reasonably be discerned" and that the trial court's factual findings are entitled to be reviewed under the manifest error standard.

COMPARATIVE FAULT
We first consider whether the trial court erred in concluding that plaintiff's action in positioning himself outside the handrail and his failure to wear the safety harness were not causes of the accident; whether it was error for the court to find plaintiff's negligence was not a cause of his own accident; and whether the court erred by concluding the negligence of Diamond M and the unseaworthiness of defendant's vessel solely caused plaintiff's injuries.
A negligence claim against a seaman's employer under the Jones Act and a claim that a vessel was unseaworthy brought against the vessel owner under the general maritime law are two distinct causes of action, each having its own separate standard of proof and causation. Johnson v. Offshore Exp., 845 F.2d 1347 (5th Cir.1988), cert. den., 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988).
A Jones Act employer is charged with a duty to exercise care to provide a reasonably safe work environment; to supervise and instruct seamen about safe methods that they can employ in carrying out their duties; and to provide adequate and proper equipment. Ceja v. Mike Hooks, Inc., 690 F.2d 1191 (5th Cir.1982); Dillon v. M.S. Oriental Inventor, 426 F.2d 977 (5th Cir.1970), cert. denied, 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed.2d 140 (1970); Courville v. Cardinal Wireline Specialists, Inc., 775 F.Supp. 929 (W.D.La.1991). The Jones Act has a liberal causation requirement, which is satisfied if the employer's negligence played any slight part or contributed in some way to producing the seaman's injuries. Brister v. A.W.I., Inc., 946 F.2d 350 (5th Cir.1991), rehearing denied, 949 F.2d 1160 (5th Cir. 1991).
When the seaman's employer is also the vessel's owner, the employer is charged with an absolute non-delegable duty to provide a seaworthy vessel under the general maritime law, which is completely independent of the duty owed to its employees under the Jones Act. Brister, 946 F.2d 350; Miles v. Melrose, 882 F.2d 976 (5th Cir.1989), affirmed, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); Johnson, 845 F.2d 1347. Liability is imposed for unseaworthiness regardless of fault, negligence, or the failure to exercise reasonable care on the part of the vessel owner. Brister, 946 F.2d 350; Miles, 882 F.2d 976; Johnson, 845 F.2d 1347. While a vessel owner is not under a duty to provide an accident-free or perfect vessel, the vessel must be reasonably suited for its intended use to be seaworthy. Johnson, 845 *144 F.2d 1347; Phillips v. Western Co. of North America, 953 F.2d 923 (5th Cir.1992). A vessel crew that is inadequately trained, that is not instructed in the use of equipment, or that engages in unsafe methods of work, can constitute unseaworthiness, as well as the failure of a shipowner to provide adequate equipment for the crew to complete an assigned task. Phillips, 953 F.2d 923; Johnson, 845 F.2d 1347; Deal v. A.P. Bell Fish Co., 674 F.2d 438 (5th Cir.1982); Kratzer v. Capital Marine Supply, Inc., 490 F.Supp. 222 (M.D.La.1980), affirmed, 645 F.2d 477 (5th Cir.1981). Furthermore, the plaintiff who seeks to recover for injuries under the theory that a vessel was unseaworthy must prove that the unseaworthy condition was a proximate cause of his injuries; namely, that the unseaworthy condition played a substantial part in bringing about or actually causing plaintiff's injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthy condition. Brister, 946 F.2d 350; Johnson, 845 F.2d 1347. The causal claim on an unseaworthiness claim is not broken even though it is established that a safer method may have existed for the performance of a task when the evidence does not establish that the seaman knew or should have known of the safer method. Johnson, 845 F.2d 1347.
Comparative negligence applies to reduce a seaman's recovery on a Jones Act claim and an unseaworthiness claim. Miles, 882 F.2d 976. Although the Jones Act seaman is charged with a duty to exercise reasonable care and to protect himself, this duty is slight because this duty "is tempered by the realities of maritime employment." Johnson, 845 F.2d at 1355; Ceja, 690 F.2d 1191. A seaman's duty is to perform his work as he is instructed, rather than to find the safest method of performing his job. Ceja, 690 F.2d 1191; Buckner v. State Boat Operators, Inc., 680 F.Supp. 239 (E.D.La. 1988). Since a seaman does not have a duty to find the safest way to perform his job, his unsafe course of conduct in executing his duties can only be considered in determining whether he was comparatively negligent where it is shown that he either knew or should have known of a safer method of performing his job. Johnson, 845 F.2d 1347; Pickle v. International Oilfield Divers, Inc., 791 F.2d 1237 (5th Cir.1986), cert. denied, 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987); Ceja, 690 F.2d 1191; Courville, 775 F.Supp. 929. Simply put, the duty to provide a safe course of conduct for the seaman to engage in while performing his duties remains primarily with the vessel owner and employer, rather than with the seaman. Johnson, 845 F.2d 1347; Ceja, 690 F.2d 1191.
In assigning written reasons, the trial court found:
It is obvious that Diamond M breached its duty as vessel owner and employer. No one was trained on how to keep the drill line off the hydraulic hose during a "cutting and slip" operation. The driller simply told Mr. Milstead to keep the drill line off the hydraulic hose. The toolpusher indicated that Mr. Milstead should have used a hook or a rope to keep the drill line off the hydraulic hose, rather than extending his body over or through the guard rail. The toolpusher never told Mr. Milstead or anyone else to use a hook or a rope. No hook was on the vessel. A spool of rope was on the vessel for general use, no one ever told Mr. Milstead to use it to keep the drill line off the hydraulic hoses. If Diamond M would have provided the necessary equipment and training to properly conduct this operation, then Mr. Milstead would not have been injured. Mr. Milstead is required to perform his duties in a non-negligent manner. The driller testified that Mr. Milstead reached through the handrail without using a safety harness contrary to the safety rules of the company. The safety harness was to protect against the risk of falling. It is obvious that the safety harness would not protect Mr. Milstead from a drill line falling on his head. Diamond M never trained Mr. Milstead to perform the "cut and slip" operation. He observed other employees reaching over the guardrail to pull the drill line from the hydraulic hoses. He simply performed his duties as others had, reaching past the guardrail to grab the drill line. The unseaworthiness of the vessel and the negligence of Diamond M caused Mr. Milstead's injuries.
*145 Evidence introduced at trial established that the drill line which fell on plaintiff was lifted substantially higher the day of the accident, without any additional safety measures being taken, than it ever had in the past and that there was a safer alternative method of performing the cut and slip operation being used by some of defendant's workers, not requiring the drill line to be lifted overhead.
Although the driller testified that the proper procedure for plaintiff to have employed when he was injured was for him to have used a rope or a hook to free the drill line from the hydraulic hose, rather than reaching out over the handrails and using his hands to grab the drill line, he testified that he had never trained, required, or showed plaintiff to use a rope and that he did not tell plaintiff to get a rope on the day of the accident. The toolpusher who was responsible for safety on the derrick and plaintiff's supervisor testified that it was his rule that his crew members who were on top of the motor shed were to use a rope or hook to grab the drill line to free it from the hydraulic hoses. But the toolpusher conceded that his rule had never been enforced.
The record shows that Diamond M did not have a training program for floor hands or roustabouts to show them how to use a rope and that employees had never been trained to use a rope. Plaintiff had not been given a rope and had never seen a rope used on the motor shed to perform the operation. There was no hook on New Era to pull the drill line away from the hydraulic hoses and while there was rope on board, there was no particular rope in the area for this operation. Furthermore, plaintiff received no special instructions or training on how to perform the operation he was assigned to do when he was injured. Plaintiff further testified that no one had cautioned him about going through the handrail and that no one gave special instructions on what to do on the motor shed.
Additionally, several Diamond M employees testified at trial corroborating plaintiff's testimony. In essence, they testified that they had not been trained to perform the operation plaintiff was performing when he was injured; that they had never been told to use a rope or taught to use a rope to pull the drill line from the hydraulic hose; and that they did not know about anything in the safety manual concerning the use of a rope or a chain to perform this task. They also testified that they had done the job that plaintiff was performing in the past and that they had never used a rope to pull the drill line away from the hydraulic lines, but rather they reached out with their hands to perform the operation and that they received no training on how to stand on the shed and pull drill line off the hydraulic hose. They did not recall their supervisors instructing them not to go through the handrail or telling them that it was wrong to lean over the handrail to knock the drill line from the hydraulic line. No one could recall seeing anything written by Diamond M that an employee should not go through the handrail for the operation plaintiff was performing. The employees also testified that sometimes the only possible way to get to the drill line was to reach through the handrail.
The toolpusher testified that he himself had seen his workers using their hands to lean over the rail and reach the drill line, but he did not stop it and he never reprimanded his employees from reaching over the handrail even though he thought in his own mind that they should have been using a rope. He stated that it was his common sense rule to avoid getting oneself past the handrails and out from under protection of an overhead beam as plaintiff had.
The testimony at trial was that plaintiff was a pretty good and safe employee who did everything he was required to do.
Based on the foregoing, we conclude that the trial court's findings that plaintiff's action in positioning himself outside the handrail and his failure to wear the safety harness were not causes of the accident, that plaintiff was not comparatively negligent, and that the unseaworthiness of the vessel and the negligence of Diamond M solely caused plaintiff's injuries are supported by the record and are not manifestly erroneous. Consequently, plaintiff's third assignment of error lacks merit.

*146 DAMAGES
The trial court awarded plaintiff $953,536.40 for past and future economic loss. On appeal, we are asked to consider whether the trial court erred in concluding that "plaintiff will not be able to return to gainful employment," and whether the award for economic loss must be reversed because it is without any foundation. Defendant does not argue on appeal that plaintiff was not entitled to past economic losses.
To be entitled to an award for future loss of earnings and loss of earning capacity, the plaintiff must prove that he has suffered serious injuries which have permanently impaired his earning capacity. Dubois v. Arkansas Valley Dredging Co., Inc., 651 F.Supp. 299 (W.D.La.1987).
The following evidence was introduced at trial with respect to impairment to plaintiff's knees and back as a result of the accident: Dr. Bomboy, plaintiff's treating orthopedic surgeon, testified that after the 1992 accident, plaintiff had two operations on his left knee, one on his right knee, and a bulging disc. He testified that it was his opinion based on a reasonable medical probability that plaintiff's injuries were related to the September 8, 1992 accident. Dr. Bomboy testified that all surgeries he performed were causally related to the accident. With respect to plaintiff's left knee, Dr. Bomboy assigned a 50% impairment and restricted plaintiff from prolonged walking, prolonged standing, climbing, squatting, kneeling, uneven surfaces, dangerous surfaces, and repetitive foot-pedal work with his left leg. Dr. Clifton Shepherd, orthopedic surgeon and defendant's expert, testified that there would be a 25% impairment to plaintiff's left knee. While Dr. Shepherd testified that he did not find evidence in plaintiff's medical records of a causal connection between the September 1992 accident and plaintiff's current left knee problems, he agreed with the restrictions Dr. Bomboy had assigned for plaintiff's left knee.
With respect to plaintiff's right knee, Dr. Bomboy assigned a 15% impairment but noted that it was not a progressive problem. For the right knee, Dr. Bomboy testified that there were no specific restrictions on future activity. Dr. Shepherd assigned a 3% to 4% impairment rating on plaintiff's right knee.
With respect to plaintiff's back, Dr. Bomboy testified that plaintiff had a bulging disc at L5-S1, would probably eventually need back surgery, and that he believed that bulging disc was causally related to the accident because his symptoms began at this time. Dr. Bomboy restricted plaintiff from manual labor or any activity requiring frequent bending, stooping, twisting, prolonged sitting. He also restricted plaintiff from lifting more than twenty five pounds on occasion and more than ten pounds repetitively. Dr. Bomboy testified that all of plaintiff's work restrictions were causally related to the September 8, 1992 accident. Dr. Shepherd found only a minimal degenerative change in plaintiff's back, which he did not attribute to the 1992 accident. Dr. Shepherd assigned no impairment to plaintiff's lower back.
It was established by expert medical opinion at trial that plaintiff is physically unable to return to offshore work. Clearly, plaintiff has suffered some loss of earning capacity and a loss of future wages. We believe that the trial court clearly did not err in awarding plaintiff the difference between the earnings that he would have received working offshore and what plaintiff would earn at a minimum wage job.
However, whether plaintiff is entitled to receive an award for future loss of earnings for the rest of his life for what he could have earned at a minimum wage job presents a closer question. Evidence was introduced at trial that jobs exist which plaintiff can perform within his physical limitations, but that he may have difficulty obtaining gainful employment because of his physical limitations caused by his accident. Furthermore, it was established at trial that plaintiff had not been released to return to work and that he currently suffered from debilitating psychological injuries which rendered him unemployable and that he would continue to suffer from them for an indefinite duration.
The case law widely differs over whether a seaman, such as the plaintiff in the present case, who is physically capable of engaging in *147 some type of gainful employment, but who may experience difficulty in obtaining such a position, is entitled to receive an award of future loss of earnings to compensate him for what he would have earned at any gainful employment; namely, whether the plaintiff is entitled to receive the difference between what he would have made offshore and at a minimum wage job.
The Seventh Circuit has held that a seaman can establish entitlement to a damage award for future loss of earnings for the remainder of his life by proving that the accident left him with a permanent impaired and disabling physical condition, and as a result of this impaired and disabling physical condition he will be unable with reasonable diligence to find gainful employment. It is not necessary for the seaman to prove that he is totally disabled to such an extent that no job exists for which he is medically fit. O'Shea v. Riverway Towing Co., 677 F.2d 1194 (7th Cir.1982).
But, in Burden v. Evansville Materials, Inc., 636 F.Supp. 1022, 1038 (W.D.Ky.1986), affirmed, 840 F.2d 343 (6th Cir.1988), the court did not award future loss of earnings for the remainder of the seaman's life but instead awarded claimant future loss of earnings for the difference between what plaintiff could make at a minimum wage job and what he could make as a seaman because the court did "not believe that the plaintiff is totally and permanently disabled in a complete vocational and medical sense in relation to other jobs in the American work environment."
This inquiry is further complicated by the indefinite duration of plaintiff's psychological problems.
With respect to plaintiff's ability to obtain gainful employment, Dr. Bomboy testified "it is my opinion that Mr. Milstead will have a great difficulty finding employment ... From a practical standpoint, a person with the type problems that he has is going to find a great difficulty finding employment." Glenn Hebert, vocational rehabilitation expert, stated "I think Eddie Milstead is unemployable" from a physical standpoint and that it was his opinion that plaintiff was totally and permanently disabled. He testified that he could not find plaintiff a job because plaintiff cannot be placed. William Stampley, vocational rehabilitation specialist, agreed with Mr. Hebert that some employers would not hire plaintiff. He also testified that there was no doubt in his mind that plaintiff would be suitable for light duty employment and that suitable positions could be found, and that there was an adequate number of light-duty jobs which plaintiff could perform. Mr. Stampley testified that it was his opinion that plaintiff would go back to work.
Dr. Randall Thomas, rehabilitational psychologist, testified that from a psychological standpoint plaintiff could not return to work because of his pain at the present time. Dr. Thomas testified that plaintiff had a very poor prognosis from a psychological standpoint and that he thought plaintiff would be in treatment for long periods of time and in and out of treatment his entire life. Dr. William Black, neuropsychologist, testified that plaintiff was a "fragile man" and that his chronic knee problems and chronic back problems would add an incredible amount of stress on his already compromised ability to perform. Dr. Black testified that he hoped with proper psychiatric treatment, plaintiff could resolve his depression and anxiety; resolve his emotional problems, enter a work training program that would prepare him to work in some other area, and return to gainful employment.
Dr. Alan Klein, clinical psychologist, testified that he thought with treatment plaintiff's depression could be addressed and plaintiff could return to gainful employment. He testified that there were probably some jobs plaintiff could perform. Dr. Klein was optimistic that if plaintiff's pain was taken away and he became better psychologically, he would return to work.
Based on the facts of this case and the different standards in the federal law, and especially in light of the O'Shea case, we are unable to conclude that the trial court was clearly wrong in finding that plaintiff was unable to return to gainful employment. Accordingly, defendant's first assignment of error lacks merit.

*148 PROOF OF ECONOMIC LOSS
Next, we consider whether the quantum of damages awarded to plaintiff to compensate him for his future economic losses is excessive. Diamond M contends that the trial court erred in accepting without explanation the figures offered by plaintiff's economist.
This court has recently considered the standards for proving future lost wages in the cases of Jenkins v. Kerr-McGee Corp., 613 So.2d 1097 (La.App. 3 Cir.1993) and Cormier v. Cliff's Drilling Co., 93-1260 (La.App. 3 Cir. 5/4/94), 640 So.2d 552. Citing with approval the rule of Jenkins, this court in Cormier said:
In Jenkins, 613 So.2d at 1104, this court laid out the basis for future lost wage calculations as follows:
It is well settled that future lost wage calculations in maritime cases are to be performed in compliance with the method set forth in Culver v. Slater Boat Co., 722 F.2d 114 (5th Cir.1983) (en banc), cert. denied sub. nom., Heinrich Schmidt Reederei v. Byrd, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984), commonly known as Culver II. This case established a four step process for determining lost wages as follows:
(1) Estimate the loss of work life resulting from injury;
(2) Calculate the lost income stream;
(3) Compute the total amount of damages;
(4) Discount the total amount to its present value.
The lost income stream is calculated by adding gross income at the time of injury to other income (fringe benefits) then subtracting required payments by the wage earner (such as taxes and work expenses). "The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned ... If forecasts of future inflation are not used, it is necessary for the factfinder to choose an appropriate below market discount rate, which process is concededly difficult". Culver, supra, at 122.
In the instant case, the reports of both economists estimated Mr. Milstead's loss of work life, calculated the lost income stream using the below-market-discount method as outlined above, computed the total damage, and discounted the total damage to present value.
Plaintiff's economist gave a pre-tax below-market discount rate of 2.40 percent. The defendant's economist arrived at a pre-tax below-market discount rate between 1.55 percent and 4.55 percent. The trial court chose the final figure given by plaintiff's economist. "In judge-tried cases, a trial court adopting a pre-tax discount rate between one and three percent will not be reversed if it explains the reasons for its choice." Culver v. Slater Boat Co., 722 F.2d 114, 122 (5th Cir.1983), cert. denied, Reederei v. Byrd, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984) and cert. denied, St. Paul Fire & Marine Ins. Col. v. Culver, 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984). In choosing the figure put forth by plaintiff, the trial court adopted a rate within the 1.00 to 3.00 percent range. We find that both reports substantially comply with the mandates of Culver II. Since neither of the economists testified, the only evidence in the record as to each's methods and reasoning lies in his report. The trial court was presented with concise economic reports with widely divergent calculations and assumptions without the benefit of any other testimony by the authoring experts. Furthermore, neither side introduced any evidence undermining or critiquing the other's report. In the absence of any evidence casting doubt on either report or an attempt to demonstrate why one report should be chosen over another, the trial court had complete discretion to rely on either report. Consequently, we cannot say that its choice in adopting the highest figure proposed by plaintiff's expert was manifestly erroneous; defendant's second assignment of error is meritless.

AGGRAVATION OF PREEXISTING CONDITION
The trial court found that plaintiff had an aggravation of a preexisting condition. *149 However, the trial court failed to address the extent of the aggravation or how it affected plaintiff's economic and general damages. Defendant contends that this was error.
Under the Jones Act and the general maritime law, when the defendant's act aggravates or accelerates a preexisting condition and renders a plaintiff unable to continue his work or awakens a dormant condition that causes a plaintiff to experience pain when he did not suffer from pain or disability prior to the aggravation, defendant can be liable in full for the disability and pain caused. Milos v. Sea-Land Serv., Inc., 478 F.Supp. 1019 (S.D.N.Y.1979), affirmed, 622 F.2d 574 (2nd Cir.1980), cert. denied, 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 219 (1980).
It was established at trial that plaintiff had sustained an injury to his left knee playing football in high school in 1983 and that, as a result, he required knee surgery on his left knee in 1984. Dr. Shepherd opined that the 1983 football injury and 1984 surgery triggered the problems he had seen and studied in plaintiff's left knee and that he did not think the impairment rating on plaintiff's knee had increased since 1984.
Dr. Bomboy, plaintiff's treating orthopedic surgeon, explained that even though plaintiff had a previous injury to his left knee in high school, plaintiff was able to function on that knee without any problems prior to the 1992 injury. Dr. Bomboy did not relate any significant amount of plaintiff's current left knee problems to that preexisting injury because plaintiff could function and work offshore.
Supporting reasons for the trial court's failure to reduce plaintiff's economic and general damages as a result of plaintiff's preexisting condition can be clearly and easily discerned from the record, especially the fact that it was undisputed at trial that plaintiff worked offshore and engaged in normal activities prior to the 1992 accident without any difficulties.
We conclude that it was not an abuse of discretion for the trial court to have not reduced plaintiff's recovery by an aggravation of preexisting condition. Defendant's fourth assignment of error lacks merit.

PREJUDGMENT INTEREST
The trial court awarded prejudgment interest to run from the date of demand on lump sum awards for past and future damages, including $953,536.40 for past and future economic loss; $150,000 for past and future physical pain and suffering; and an additional $150,000 was for past and future mental pain, anguish and loss of enjoyment of life. We are asked to consider whether the trial court erred by awarding prejudgment interest on future damages.
Where a Jones Act claim and an unseaworthiness claim are joined together and tried to the court, as in this case, the trial court has discretion to award interest on both claims. McPhillamy v. Brown & Root, Inc., 810 F.2d 529 (5th Cir.1987); Williams v. Reading & Bates Drilling Co., 750 F.2d 487 (5th Cir.1985).
The United States Fifth Circuit has explained that as a general proposition, prejudgment interest should be awarded not as a penalty, but rather to compensate the employee for the employer's use of funds before judgment to which the employee was rightfully entitled. Brister, 946 F.2d 350; Ceja, 690 F.2d 1191. Consistent with the rationale behind this general rule, the United States Fifth Circuit has concluded that this general proposition is limited by the rule that prejudgment interest can only be awarded on past damages and cannot be awarded on future damages because the employee was not entitled to them before the trial. Brister, 946 F.2d 350; Martin v. Walk Haydel & Associates, Inc., 794 F.2d 209 (5th Cir.1986); Williams, 750 F.2d 487.
In Pickle, 791 F.2d 1237, the Fifth Circuit was specifically asked to consider whether the district court erred in awarding damages for loss of future pain and suffering and for loss of future income. While it is clear from the opinion that pre-judgment interest is unavailable on future, unaccrued non-economic damages such as future pain and suffering, it is unclear whether pre-judgment interest is also unavailable on post-judgment economic *150 damages that have been reduced to present value; namely, loss of future earnings.
This court has interpreted Pickle to only preclude the award of prejudgment interest on future non-economic damages and to allow for prejudgment interest on future economic losses, such as future lost earnings. McFarland v. Justiss Oil Co., Inc., 526 So.2d 1206 (La.App. 3 Cir.1988).[3]
But, in Savoie v. McCall's Boat Rentals, Inc., 491 So.2d 94 (La.App. 3 Cir.), writs denied, 494 So.2d 334, 542 (La.1986), this court relied on other federal jurisprudence and held that prejudgment interest is not allowed on awards for loss of future earnings and future pain and suffering.[4]
In Watterson v. Mallard Bay Drilling, Inc., 93-1494 (La.App. 3 Cir. 10/12/94); 649 So.2d 431, writ denied, 94-2769 (La.1/27/95); 650 So.2d 241, the trial court awarded $250,000 for pain and suffering and $248,508 for past and future economic loss and awarded prejudgment interest commencing with the date of judicial demand. Mallard Bay contended that the award of prejudgment interest on items of future damages constituted error. In that case, this court noted that there was a difference in this circuit over whether pre-judgment interest could be awarded on future economic losses and that the trial court did not apportion the award between past and future losses. That panel of the third circuit declined to resolve the issue of whether pre-judgment interest could be awarded on future economic losses. Furthermore, it decided that it would present an undue burden on the court and the litigants to remand the case for the trial court to apportion the award between past and future losses. This court then upheld the award of interest because "[t]he trial judge could have awarded prejudgment interest on past damages from the date of the accident (October 23, 1990) as opposed to suit date (April 23, 1991) and could have denied post-judgment interest altogether. By making all damages subject to interest, but dating only from judicial demand, the result is fair and certainly not an abuse of the trial court's discretion." 93-1494 at p. 16; 649 So.2d at 439.
As in Watterson, the trial court in this case awarded prejudgment interest on the entire damage award commencing with the date of judicial demand and failed to apportion the damage award between past and future losses. Rather than resolving the difference in our circuit over whether prejudgment interest can be awarded on future economic losses and remanding the case for the trial court to apportion the damage award between past and future losses, we conclude that the award of interest was fair and within the trial court's discretion and leave undisturbed the award of prejudgment interest on the entire award commencing from the date of demand. We believe this to be fully in accordance with the rationale set forth in Watterson.[5]

FUTURE MEDICAL EXPENSES
Mr. Milstead also contends that the trial court erred in failing to award future medical expenses.
Under the general maritime law, defendant as a vessel owner, is obligated to pay "cure," which includes medical, therapeutic, and hospital expenses, until plaintiff reaches maximum recovery. Pelotto v. L & N Towing *151 Co., 604 F.2d 396 (5th Cir.1979); Kratzer, 490 F.Supp. 222. In both its written reasons for judgment and its oral reasons for judgment, the trial court stated that plaintiff had not reached maximum medical cure and that defendant was obligated to continue providing cure. Although these factual findings of the trial court are not subject to reversal on appeal because neither plaintiff nor defendant seeks to overturn these findings, we note that the judgment signed by the trial court is silent with respect to defendant's continuing obligation to provide cure. Simply put, when a disparity exists between the judgment and the written reasons for judgment, the judgment itself controls. Thurman v. Thurman, 521 So.2d 579 (La.App. 1 Cir.1988).
The plaintiff assigns as error the trial court's failure to award future medical expenses but does not specifically seek to modify the judgment to conform with the trial court's findings that plaintiff had not reached maximum medical cure and that defendant is obligated to continue providing cure until plaintiff reaches maximum medical cure. Nevertheless, we believe that the issue of whether the trial court erred in not awarding plaintiff future medical expenses is inextricably interrelated to the trial court's factual findings with respect to plaintiff's entitlement to cure and that any errors concerning defendant's continuing obligation to provide cure may be considered by us. Furthermore, since the record clearly demonstrates that the trial court on two occasions evidenced an intent to award cure in the final judgment, we conclude that the interests of justice require an amendment of the judgment to conform the judgment to the trial court's ruling.
Plaintiff contends that the trial court's failure to award a lump sum award for plaintiff's future medical expenses constituted error. Plaintiff seeks a total of $83,000, including: (1) $25,000 for a total knee replacement; (2) $18,000 for a lumbar laminectomy; (3) $20,000 for Touro Pain Management Clinic; (4) medications for the indefinite future (plaintiff suggests $150 per month for ten years); and (5) $500 per year for ten years for psychiatric evaluation treatment and follow-up care.
With respect to the knee replacement surgery, Dr. Bomboy testified that plaintiff would eventually need a total knee replacement. Dr. Shepherd testified that it was difficult to predict whether plaintiff would need a total knee replacement because some with this type of condition function throughout life with no difficulties. With respect to the lumbar laminectomy, Dr. Bomboy testified that there was no evidence of mechanical instability in plaintiff's back and that no drastic changes were anticipated for plaintiff's lower back. Although Dr. Bomboy did not recommend surgery at the present time, he opined that it was more probable than not that plaintiff would require the surgery in the future. Dr. Shepherd agreed with Dr. Bomboy that plaintiff's back was stable and that no drastic changes were anticipated. He did not recommend any immediate or future definitive surgical procedure. Based on the conflicting medical evidence, whether plaintiff would need these surgeries remains speculative. Consequently, we are unable to conclude that the trial court committed error in failing to award a lump sum for a future knee replacement or the future lumbar laminectomy.
On the issues of the Touro Pain Clinic treatment, medications and psychiatric treatment, we determine that the trial court did not err in failing to award a lump sum for this treatment because defendant is obligated to provide this treatment under its cure obligation to the point when maximum medical cure is attained. A damage award beyond that point would be speculative and accordingly, plaintiff's first assignment of error lacks merit.

PUNITIVE DAMAGES
Finally, we are asked to consider whether the evidence preponderates that defendant was arbitrary and capricious in denying plaintiff's maintenance and cure claim and whether the trial court erred in failing to award punitive damages.
Punitive damages may be awarded under the general maritime law against a shipowner who unreasonably, arbitrarily and capriciously refuses to pay maintenance *152 and cure. Morales v. Garijak, Inc., 829 F.2d 1355 (5th Cir.1987).
The award must be based on callous, recalcitrant, willful and wanton, egregious and intentional disregard for the seaman's right. Consequently, if a shipowner has a reasonable basis for denying maintenance or cure, he is only responsible for paying the maintenance and cure owed and is not liable for punitive damages. Breese v. A.W.I., Inc., 823 F.2d 100 (5th Cir.1987); Morales, 829 F.2d 1355.
Kenneth Bradley, claims manager for Diamond M, testified that he did not pay the Stonewall Discount Pharmacy bill because he believed that Dr. Bomboy had sort of indicated that plaintiff had reached maximum medical cure. He further testified that he had not paid for plaintiff's second surgery to his left knee because there was a question over whether it was related to the accident. Finally, he explained that Dr. Rubin's bill was not paid because he thought it was not relevant to plaintiff's treatment or to the case.
Based on the foregoing, we are unable to conclude that the factual findings of the trial court that defendant was not arbitrary and capricious were manifestly erroneous. Furthermore, the United States Fifth Circuit recently held in an en banc decision that punitive damages are unavailable for non-payment of maintenance and cure under the general maritime law. Guevara v. Maritime Overseas Corp., 59 F.3d 1496 (5th Cir.1995). Consequently, plaintiff's second assignment of error lacks merit.

DECREE
The judgment is amended to award plaintiff "cure" until he reaches maximum medical recovery in accordance with the trial court's oral and written reasons for judgment. In all other respects, the trial court's judgment is affirmed. Costs of this appeal are to be divided equally between plaintiff and defendant.
AFFIRMED AS AMENDED.
NOTES
[1] Plaintiff sued Diamond M Offshore, Inc., and Diamond M-ODECO Offshore, Inc., which now are together known as Diamond Offshore Drilling, Inc.
[2] In Hanks v. Barge Transport Co., Inc., 563 So.2d 1297 (La.App. 3 Cir.), writ denied, 569 So.2d 964 (La.1990), this court cited Daigle and Icicle Seafoods, Inc. and held that Louisiana state law controlled the standard of review in Jones Act and maritime cases brought in the Louisiana court system. But, then in Barks v. Magnolia Marine Transport, 617 So.2d 192 (La.App. 3 Cir.), writ denied, 620 So.2d 876 (La.1993), this court followed Trahan and held that federal law governed the standard of review in a Jones Act case. Subsequently, in Cormier v. Cliff's Drilling, 93-1260 (La.App. 3 Cir. 5/4/94); 640 So.2d 552, this court concluded that the failure to follow Daigle in Barks was wrong and once again held that Louisiana law governed the standard of review on Jones Act claims, unseaworthy claims brought under general maritime law, and findings on a plaintiff's comparative fault. But, in Alleman v. Brownie Drilling Co., 93-1668 (La.App. 3 Cir. 11/23/94); 647 So.2d 371, writ denied, 95-397 (La. 3/30/95); 651 So.2d 843, this court once again held that federal law controlled the standard of review in a Jones Act case.
[3] See also Babineaux v. Lykes Bros. S.S. Co., Inc., 608 So.2d 659 (La.App. 3 Cir.1992), writ denied, 610 So.2d 819 (La.1993), wherein this court followed McFarland and held that the trial court properly awarded prejudgment interest on the damage award for future economic losses and properly excluded prejudgment interest on the damage award for future non-economic losses. Similarly, in Gray v. Texaco, Inc., 610 So.2d 1090 (La.App. 3 Cir.1992), writs denied, 616 So.2d 686, 687 (La.1993), this court followed McFarland and held that prejudgment interest can be awarded on all damages (including future lost wages) except future non-economic damages.
[4] See also Smith v. Flotation Services, Inc., 596 So.2d 343 (La.App. 3 Cir.1992), which followed Savoie and held that the trial court correctly refused to award prejudgment interest on loss of future wages.
[5] See also Barks v. Magnolia Marine Transport Co., 617 So.2d 192 (La.App. 3 Cir.), writ denied, 620 So.2d 876 (La.1993), where this court upheld an award of prejudgment interest on the entire judgment, including future economic and non-economic losses, because the prejudgment interest on the entire award commenced with the date of judicial demand rather than the date of loss, not withstanding the fact that the judgment apportioned past and future losses.