EDALEY, Judge.
In this admiralty case, defendant, St. James Stevedoring, appeals the trial court’s judgment finding it 90% liable in the injury of their employee, plaintiff, Jerry Allen. A co-defendant, Veracity Shipping Company, Ltd., was found 10% liable (plaintiff settled with this party prior to trial). St. James also appeals the award of $300,000.00 to plaintiff for future lost wages. Plaintiff, Jerry Allen, answered the appeal, requesting that this court find St. James 100% liable, and seeking an increase in the damage awards. For the following reasons, we affirm the trial court’s judgment.
Allen was an employee of St. James when he was injured on March 20, 1996. He filed suit against St. James Stevedor-ing and Veracity under the Jones Act and General Maritime Law. St. James filed a cross-claim against Veracity. The case went to a bench trial on August 5, 6, and 7, 1998. During the trial, Allen settled his claims against Veracity and assumed the defense of Veracity on the cross-claim filed by St. James. The court rendered judgment in favor of Allen and against St. James and | «Veracity, finding St. James 90% at fault and Veracity 10% at fault. The trial court awarded the following amounts in damages to Allen:
$100,000.00 for past pain and suffering;
$ 25,000.00 for future pain and suffering;
$ 56,000.00 for past wage loss; and
$300,000.00 for future wage loss.
The trial court found that Allen’s claim against St. James Stevedoring arose under the Jones Act, it being uncontested that he was a seaman assigned to that vessel. It further found that Allen’s claim against the MTV ALEXIA arose under general maritime law negligence. Neither party to this *1234 appeal challenges the application of that substantive law.
The trial court determined that Veracity furnished a defective Jacob’s ladder. It also determined that the ladder was furnished at the request of St. James, who also had a duty to determine if the ladder conformed to industry standards and was placed safely for the crew’s use. The trial court found that St. James breached those duties. The trial court declined to find any comparative fault on the part of the plaintiff.

FACTS

Jerry Allen was working as a deckhand with St. James Stevedoring when he fell from a Jacob’s ladder tied to the bulwark of the M/V ALEXIA (sometimes referred to as the ship) twenty-five (25) feet to the deck of the D/B MARGARET (sometimes referred to as the rig or barge), a derrick barge mounted with a pedestal crane used in mid-stream cargo operations. They were engaged in discharging bulk fertilizer from the M/V ALEXIA, a vessel owned by Veracity. No one witnessed his accident, although several deckhands and St. James personnel were in the vicinity and saw him land on the deck of the D/B MARGARET. He sustained a fractured wrist, fractured pelvis, fractured heel, and other injuries.
I/The St. James special projects manager, Burton Gonzales, testified that their contract with Veracity required the placement of an accommodation ladder (or gang plank) from the ship to the rig with 24 hour access for the St. James personnel. The accommodation ladder was described as a fixed ladder with handrails, standard sized rungs, and a safety net, like a fixed staircase. On the day of the accident, the stevedoring operations (and the MARGARET) were located in the portside stern of the M/V ALEXIA, and the accommodation ladder was located starboard. The only way for the deckhands to use the accommodation ladder was to call a crew boat to take them from the accommodation ladder around to the barge.
The St. James supervisors also requested that the M/V ALEXIA rig a Jacob’s ladder from the ship to the deck of the barge. The Jacob’s ladder was described as a portable rope ladder with metal rungs tied to the bulwark of the M/V ALEXIA and extending down to the deck of the barge, some 25 feet below.[1] Pictures taken of the ladder on the day of the accident allowed witnesses to measure the distance between the rungs as 20 inches and the depth of the rung tread as 3 inches.[2] Pictures also showed that the bulwark where the ladder was tied was slanted, causing the ladder to hang at a slant, with approximately 4-6 inches of differential slope from one end of the rungs to the other. Industry standards for Jacob’s ladders were a 12 inch distance between rungs and a minimum tread depth of Ak inches.
St. James itself did not own any Jacob’s ladders, and the one involved in this accident was owned and supplied by Veracity. Other witnesses, Kenneth Wilkins (the St. James supervisor on duty at the time of the accident), Kenny Delaune (a crane operator for St. James), and Focus Green (a deckhand), all testified that St. James |fidoes not provide any training to its men on the proper use of a Jacob’s ladder, and further did not hold any regular safety meetings or training while these men worked there.
Gonzales[3] testified that the M/V ALE-XIA crew was responsible for deciding where to tie the Jacob’s ladder and that his crew would have had no authority in the placement or securing of the ladder. Gonzales testified that his crew was not required to use the Jacob’s ladder to cross from the vessel to the barge. Any crew member can choose whether to take the ladder or call the crew boat. At the time of this accident, St. James had five rigs *1235 working midstream operations and used one crew boat between them to transport personnel. Deckhands did not have radios to call the crew boat, but each supervisor did, and there was a radio in the crew shack on the D/B MARGARET available for deckhands’ use. Therefore, if on the M/V ALEXIA, a deckhand would have to request that a supervisor call the crew boat.
Gonzales testified that his supervisors are instructed to determine if the placement of the Jacob’s ladder was “safe.” If the placement was unsafe, he would expect the supervisor to notify the ship’s crew and have the location of the ladder corrected.
At the time of this accident, the Jacob’s ladder was tied to the stern bulwark, approximately 6 feet higher than the deck of the M/V ALEXIA. A person using it would have to crawl on to the bulwark and feel for the ladder with his feet and straddle the bulwark going over. No additional ladder or safety device, such as a fixed stanchion which a deckhand could hold on to, was placed where the ladder was tied off. After the accident, Gonzales said that he had the crew pull up the Jacob’s ladder to see if anything was wrong with it, but he couldn’t detect a problem with it.
| fiKenny Wilkins, Allen’s supervisor, testified to many of the same matters as Gonzales. He said that just before the accident, he told Allen and others to leave the ship and go to the barge, but he didn’t tell them how to get there. In his deposition, he testified that he may have told them to use the Jacob’s ladder. He saw Focus Green, another deckhand, go down the ladder prior to the accident. He testified that neither he nor any of his crew ever moved or placed this ladder, because it was the job of the M/V ALEXIA crew. Wilkins testified that Jacob’s ladders are faster and more convenient than the accommodation ladder for moving men from ship to rig.
On cross, Wilkins said the men are expected to exercise some judgment as to the safety of a situation. Wilkins said that he could have turned down the ladder if he felt it were not safe. He said that another deckhand, Focus Green, went down the ladder ahead of Allen, so he supposed that any slack that might have existed would have been pulled out by Green. Wilkins also said that another deckhand, Howard Green, didn’t want to use the Jacob’s ladder that day, so the crew boat was called for him.
Kevin Delaune, a crane operator on the D/B MARGARET, corroborated Gonzales’s and Wilkins’s testimony that any deckhand could have a supervisor call the crew boat. He testified that he would never use a ladder that was tied at an angle, as this ladder was, and had it been him, he would have called the crew boat. He did not use this particular ladder, but he knew that the rungs were further apart on this ladder than on other Jacob’s ladders.
Ronald Barlow, a supervisor with St. James, testified that when he went to the site, he did not notice anything unusual about this Jacob’s ladder. He climbed the ladder after the accident, and as best as he can remember, it was hanging correctly, although in his deposition he said he noticed it was hanging on a slope. He agreed that as a supervisor it was his job to make sure the equipment provided was safe for |7his crew, and that if he didn’t like the placement of the Jacob’s ladder, he could ask the ship to move it. He said that even if the bulwark curved, there was a way to tie the Jacob’s ladder so that the rungs were level.
The plaintiff called David Cole as an expert in marine safety. In his opinion, the ladder was improperly constructed as per Coast Guard and SOLAS (Safety of Life at Sea) regulations. The spacing between the rungs was excessive: 20 inches rather than 12, and the tread depth was 3 inches instead of a minimum required inches. He admitted, however, that Allen’s description of the fall did not seem to implicate the ladder’s design.
*1236 Cole found that the ladder was rigged improperly, because anyone using it would have to climb down holding on to only the bulwark or the ladder itself, which was not safe, and there was no boarding device such as hand holds on. the ship. Further, at this position, the bulwark was slanted and caused the ladder to lay at a slant, which increased the danger.
Cole also felt that inadequate training played a role in this accident. Proper training would have told the deckhands that a ladder tied on a slant was unacceptable from a safety standpoint. He felt both the crew of the MTV ALEXIA and the stevedoring company were in positions to correct the defectively designed and placed ladder, and that they failed to take any action.
A.J. Breaux, a former employee of St. James, testified. He said that if Wilkins had told Allen to use the Jacob’s ladder, it would have been insubordination for Allen to refuse and request the crew boat and further, that Allen did not have the authority to call the crew boat. Breaux said that he knew of someone who had been reprimanded for calling a crew boat, but he could not recall his name. He also said that if he had been ordered to use a Jacob’s ladder by a supervisor, he would have done so whether he felt it was safe or not.
IsFocus Green, a deckhand, testified that he had worked at St. James for three years and that he was working with Allen when he was hurt. He had looked at the ladder and noticed that the rungs were farther apart than other Jacob’s ladders. He said that he and his brother Howard, who also worked for St. James, told Wilkins the ladder was not proper, but they didn’t discuss it with Allen, and during the first couple of days on this operation, the M/V ALEXIA was low enough in the water that they didn’t need the ladder.
Edward B. Robert, Jr. testified as an expert in marine safety and accident reconstruction. He felt that this Jacob’s ladder was unacceptable in both design and rigging. He noted that it was rigged with a 4 inch slant and that there was no access ladder over the bulwark to the ladder at the time of the accident. He felt Allen was using the equipment provided to him and was following the instructions given him at the time of the accident. Robert felt that the primary cause of this accident was St. James’s request for the ladder and requiring the men to use the Jacob’s ladder instead of the accommodation ladder. He also found fault with the rigging. He saw that the ladder was flush against the hull, and the ANSE regulations require at least 7/£ inches of clear space between the rung and the nearest permanent obstruction behind the rung.
Robert found that the plaintiffs lack of instruction on how to use this ladder and St. James’s lack of safety program contributed significantly to this accident. Robert felt that if the supervisors would have been properly trained to do pre-job safety analysis, they could have identified the problems with this ladder. Robert could not definitely state that the 20 inch rung spacing caused Allen to fall.
Plaintiff, Jerry Allen, testified next. At the time of trial, he was 30 years old. On the day of the accident, after working on the ship for several hours, he talked to Kenny, who said that they needed to go down on the rig. Kenny told him to use' the 19Jacob’s ladder. Kenny did not call a crew boat and the crew boat was gone by this time. Allen was never trained to use a Jacob’s ladder, but just followed what he saw other people doing.
Allen testified that he climbed up the bulwark, put his right leg over while holding on to the bulwark with his hands, put his left leg over and went to put his right leg on the ladder. He had to let one hand go of the bulwark to grab the ladder. At this point he had both feet on the ladder. He said as he went to put his right leg one rung lower, something happened with the ladder, and the next thing he knew, he was lying on the deck. He never got his right foot on the next rung.
*1237 Allen said that he knew it was safe for him to use the ladder because Wilkins told him to use it. He had never called a crew boat to come around for him while he was working at St. James. His direct supervisor had told him to use the ladder, so that was what he did. He was happy following directions and doing what he was told to do. He did consider himself to be a safe worker. If he had had any reason to believe that this ladder was unsafe, he would not have used it.
Allen described his injuries as a crushed right heel, broken pelvis, broken right hip, crushed right wrist, broken nose and head wound above the right eye. He was in the hospital twelve days and had three surgeries. After the surgeries, his doctor, Dr. Robichaux, prescribed physical therapy for his hand and hip. Allen also participated in a work hardening program and was released by his doctor in February of 1997 for light duty work. Allen’s doctor gave him several restrictions, not to lift more than 50 pounds nor carry it more than 50 feet and not to climb more than three or four steps high. The doctor said he probably would not be able to return to the same kind of job he had at St. James. Physically, Allen has residual pain and reduced mobility from his injuries, which his doctor told him he would likely experience for the rest of his life.
ImAllen has held several jobs since being injured. One was delivering for a small company called ESP, one was in the shipping and receiving department of UPS. At the UPS job he had trouble with the paperwork, due to his limited education.[4] In all, he applied for fifteen jobs and worked at four. The jobs included pizza delivery and janitorial services. At the time of trial, he was working part-time as an assistant in a home maintenance business. Pri- or to working at St. James, he had been a welder at various locations.
At the time of his injury, Allen testified that he worked approximately 84-90 hours per week at $8.00 per hour. Had he not been hurt, he thought he would have continued working at St. James, because he liked the steady work. No one from St. James had approached him about returning, nor has he contacted them, because he knew that St. James did not have any light duty jobs.

ANALYSIS

St. James appeals both the percentage of fault assigned to it (90%) and the amount awarded Allen for future lost wages, $800,000.00. St. James argues that it should be assessed only 65% of the fault, with 25% assigned to Veracity, and 10% contributory negligence assigned to the plaintiff.
St. James argues that under Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (C.A. 5th Cir.1996), both St. James and Allen owed a reasonable duty of care to avoid accidents.
A Jones Act employer is charged with the duty to exercise reasonable care to provide a reasonably safe work environment; to supervise and instruct seamen about safe methods that they can employ in carrying out their duties, and to provide Inadequate and proper equipment. Milstead v. Diamond M Offshore, Inc., 94-1582 (La.App. 3 Cir. 9/6/95), 663 So.2d 137. A vessel crew that is inadequately trained and that is not instructed in the use of equipment can render a vessel unseawor-thy. Id.
The shipowner owes the stevedore and its employees a duty to exercise due care under the circumstances. Gaines v. Daiichi Chuo Shipping (American), Inc., 95-1597 (La.App. 4 Cir. 4/24/96), 673 So.2d 1192. Quoting the U.S. Supreme Court in Scindia Steam Nav. Co., Ltd. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Fourth Circuit recognized the following three duties of the shipowner:
(1) The “turnover duty” to provide safe conditions and a duty to warn of known, non obvious hazards when the *1238 shipowner turns over the ship to the stevedore upon commencement of steve-doring operations;
(2) The duty to exercise reasonable care to prevent injuries to longshoremen in areas that remain under active control of the vessel; and
(8) The duty to intervene, arising when the shipowner has knowledge of the hazard and that the stevedore, in exercising improvident judgment in continuing to work in the face of it, cannot be relied on to remedy the hazard or work around it.
Id. at 1195.
A shipowner may be negligent for failing to eliminate an obvious hazard that it could have eliminated, but only when it should have expected that an expert stevedore could not or would not avoid the hazard and conduct cargo operations in a reasonably safe manner. Gaines v. Daiichi Chuo Shipping (American), Inc., supra; Kirsch v. Plovidba, 971 F.2d 1026 (8 Cir.1992).
The trial court found that while Veracity may have provided a defective ladder, whose defect was a cause in fact of Allen’s injury, St. James was also responsible because it inspected and accepted the ladder and had complete authority to decide whether and in what circumstances to use the ladder. Further, St. James was responsible for the placement of the ladder as well. Though their personnel could not |, amove the ladder, St. James was responsible for determining whether the ladder’s placement was safe and should have requested that the ladder be rigged where it did not hang at a slant.
The testimony in the record supports the trial court’s conclusions. St. James’s personnel (Gonzales, Wilkins, and Barlow) felt that there was nothing wrong with the ladder, either in its design or its placement, when the expert testimony clearly established otherwise. This lack of knowledge/training on the part of St. James personnel was a large factor in Allen’s accident. Further, the St. James supervisors were on notice, through Focus Green and his brother, that the Jacob’s ladder had aberrant rung spacing, yet they did nothing to remedy the problem.
We decline to assess any fault to this plaintiff. The testimony reflects that St. James did not train him in any safety measures or in the use of ladders, instead relying on his experience and the fact that he might have been properly trained in the past. Further, the record reflects that he was just following orders. The trial court concluded that St. James was clearly in a superior position to provide and control the safety of the work place in this case and in fact had a duty to do so. Holmes v. Daybrook Fisheries, Inc., 98-1824 (La.App. 4 Cir. 2/24/99), 730 So.2d 1006. The record contains a sufficient factual basis to support the trial court’s assessment of fault.

FUTURE LOST WAGES

St. James argues that the evidence is inadequate to support the trial court’s . award of $300,000.00 for future lost wages.
Plaintiffs economic expert, Dr. Randy Rice, gave a report to plaintiff that was entered into evidence in lieu of testimony. The defendants did not submit any expert testimony regarding economic damages.
|13Pr. Rice’s report established Allen’s future lost wages as $299,934.00, based upon his earning history with St. James and an assumption that he could obtain full time employment at only minimum wage following the accident. St. James argues that the assumption that plaintiff will only be able to secure minimum wage employment is speculative, in light of the fact that plaintiff is a certified welder.
Allen’s injuries were serious and extensive, and have resulted in physical limitations and residual pain. Allen is also functionally illiterate and has trouble with jobs that require reading or computer skills. Allen testified that after he finished the work hardening program, he got four jobs. One, a delivery job, required Allen to use a computer to enter orders, and he was un *1239 able to master that skill. Another, with UPS, required Allen to perform paperwork that was difficult and beyond his capabilities. With his educational history, it is clear that Allen’s skills are best suited to manual labor, which he cannot perform now except under significant physical limitations. At the time of trial, he was employed part-time as an assistant in a home maintenance business. After reviewing all the evidence, we cannot say that the trial judge erred in relying on Dr. Rice’s report and thus, we find that the award of $300,-000.00 is not manifestly erroneous.
Accordingly, the judgment of the trial court is affirmed. All costs of this appeal are taxed to St. James Stevedoring.
AFFIRMED.

.The distance between the ship and the deck of the barge increased as the ship was unloaded.

. The ladder was not available for trial.

. And the other St. James witnesses — Kenneth Wilkins, Kenny Delaune, Focus Green.

. Allen finished eighth grade and did not get a GED.